**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

JAMES MASTERSON, REBECCA
TENGES, and THE MASTERSON
METHOD, INC.,

        Plaintiffs,

v.

DAN HERETH, in his official capacity as
Secretary of Wisconsin's Department of
Safety and Professional Services, and JOSH
KAUL, in his official capacity as Wisconsin's
Attorney General,

        Defendants.

Case No.    3:26-cv-365

## VERIFIED COMPLAINT

### INTRODUCTION

Plaintiffs Jim Masterson and Becky Tenges want to teach Jim's internationally-known method of animal care to students who are eager to learn. But Wisconsin's Department of Safety and Professional Services—which administers the state's Educational Approval Program—says they can't, unless they subject themselves to the onerous requirements of Wis. Stat. § 440.52. But Wisconsin has a problem: teaching is speech, and Wisconsin's Educational Approval Program violates the First Amendment. It imposes significant burdens on speech, which are based on the content of that speech, and it is not narrowly tailored to a compelling governmental interest.

1

## JURISDICTION AND VENUE

1.        Plaintiffs bring this civil-rights action under the First and Fourteenth Amendments to the U.S. Constitution; the Civil Rights Act of 1871, 42 U.S.C. § 1983; and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.

2.        Plaintiffs seek declaratory and injunctive relief against the enforcement of Wis. Stat. § 440.52 ("the Act"), regulations promulgated under the Act, Wis. Admin. Code SPS § 401.01, *et seq.*, and the practices and policies of the Department under the Act, which deprive Plaintiffs of their First Amendment right to teach Jim's signature method of animal care to willing students.

3.        This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

4.        Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(1). Upon information and belief, Defendants operate in their official capacities in Madison, Wisconsin.

## THE PARTIES

**Plaintiffs**

5.        Plaintiff James ("Jim") Masterson, an individual, is a U.S. citizen who lives in Fairfield, Iowa.*

6.        Jim is the founder, co-owner (along with his wife), and Chief Executive Officer of Plaintiff The Masterson Method, Inc. ("Jim's school"), an Iowa corporation headquartered in Fairfield, Iowa.*

---

* The factual allegations in this and subsequent paragraphs denoted by an asterisk ("*") are within the scope of one of, or both of, the two executed Verifications that are contained at pages 31-33 of this Complaint.

7.      Jim's school offers a variety of courses teaching Jim's namesake "Masterson Method" of animal care.*

8.      Plaintiff Rebecca ("Becky") Tenges is an instructor with Jim's school. She is a resident of Cedarburg, Wisconsin.*

**Defendants**

9.      Defendant Dan Hereth is the Secretary of the Department of Safety and Professional Services. He is sued in his official capacity only.

10.     Defendant Hereth is vested by statute with the powers and duties of the Department.

11.     Wisconsin's Educational Approval Program ("EAP") is housed within the Department and is charged with administering the Act.

12.     Defendant Hereth is therefore responsible for administering the statutory regime that would prohibit Plaintiffs from teaching Jim's namesake method of animal care without initial approval and ongoing regulation.

13.     Defendant Josh Kaul is the Attorney General of Wisconsin. He is sued in his official capacity only.

14.     As the Attorney General of Wisconsin, Defendant Kaul is vested with enforcement power over key provisions of the Act. Wis. Stat. § 440.52(8)(h), (10)(d).

15.     Defendant Kaul therefore has the ability and responsibility to enforce the statutory regime that would prohibit Plaintiffs from teaching Jim's namesake method of animal care without initial approval and ongoing regulation.

3

16.    The Department has threatened to refer Jim's school to Defendant Kaul for enforcement.*

17.    The Department's implementation of the Act in general and as applied to Plaintiffs, and its threat to refer Jim's school to Defendant Kaul for enforcement, poses an ongoing harm to Plaintiffs' First Amendment Rights.*

## FACTUAL BACKGROUND

**Jim has developed an internationally known method of animal care.**

18.    Plaintiff Jim Masterson has developed a signature method of horse care, now known worldwide as the "Masterson Method."*

19.    Jim is an expert on equine performance bodywork.*

20.    Jim has worked with horses for decades.*

21.    Jim started his journey by working at a stable for equestrian horses.*

22.    Equestrian horses are athletes, and they need physical recovery just like any other athlete.*

23.    As Jim observed different practitioners work on horses, he noticed that those horses would respond with subtle physical cues. Jim was determined to develop techniques that would be responsive to those cues and so allow the horses to relieve tension.*

24.    The resulting system of bodywork was centered around working *with* the horse to relieve tension, rather than simply working *on* the horse, in contrast to other forms of bodywork such as massage, which involve more physical pressure on the horse. And so, the "Masterson Method" was born.*

4

25.     Jim refined his signature method in the performance-driven environment of the equestrian circuit. Word of mouth spread and his clientele grew.*

26.     Soon, Jim was using his signature method on horses competing in top competitions.*

27.     In 2006, Jim worked with the U.S. Equestrian Endurance Team at the World Equestrian Games in Germany. Over the next eight years, Jim would continue to work with the U.S. Equestrian Team at multiple international competitions, from Malaysia to France.*

28.     Although Jim was initially the sole practitioner of his method, there was so much interest and demand for his services that he started teaching his signature method to others in the mid-2000s.*

29.     His cornerstone offering is a weekend seminar where students practice basic Masterson Method techniques on horses.*

30.     Since he started teaching the Masterson Method, thousands of people—owners, therapists, trainers, or just plain horse enthusiasts—have attended his cornerstone weekend seminar. Jim's cornerstone weekend seminar has been offered around the world, including in Canada, Europe, Asia, Australia, and New Zealand.*

31.     Multiple private professional organizations, including the National Certification Board for Therapeutic Massage and Bodywork, have endorsed Jim's cornerstone weekend seminar to satisfy continuing education requirements.*

32.     In 2011, Jim published a book, *Beyond Horse Massage*, detailing his method. Since then, *Beyond Horse Massage* has been translated into multiple languages.*

33.     Jim's work has been the subject of an award-winning documentary film.*

34.     Over the years, Jim's school has expanded its offerings. For example, there is now a course tailored to teaching equine therapists how to deploy basic Masterson Method techniques into their practice.*

35.     In 2025, hundreds of students attended over 50 courses that Jim's school conducted in the United States.*

36.     A great number of the barns that host Masterson Method Courses do so on a volunteer basis. They do so because they're interested in the Masterson Method and value the benefit that the bodywork brings to their horses.*

37.     Jim's school also offers certifications for people who want to become proficient in the Masterson Method.*

38.     Jim's flagship certification program is the Masterson Method Certified Practitioner program (the "Certified Practitioner" program).*

39.     The Certified Practitioner program is a multi-step process that entails at least 426 training hours.*

40.     The Certified Practitioner program requires multiple additional courses, including an advanced five-day course. It also requires thirty fieldwork sessions where trainees apply the Masterson Method to local horses.*

41.     Jim's school advises prospective students that they should expect to take between 9 months and 2 years to complete the Certified Practitioner program in its entirety.*

42.     Students can take the additional courses required to become a Certified Practitioner—like Jim's advanced five-day course—without seeking to become Certified

Practitioners. Many students who take the advanced five-day course have no intention of trying to become Certified Practitioners.[*]

43.     People become Certified Practitioners for a variety of reasons. Some are equine professionals (e.g., trainers, practitioners of traditional horse massage, or veterinarians) who are looking to add another skill to their toolkit. Others may only be looking to care for their own horses.[*]

44.     Jim's advanced five-day course is approved for continuing education credits by the National Certification Board for Therapeutic Massage and Bodywork.[*]

45.     Although many of the students in the Certified Practitioner program plan to use Jim's signature methods professionally, Jim's marketing focuses on the effectiveness of his method, not on career opportunities that studying the method might open up.[*]

46.     For his part, Jim's dream is that every horse on the planet experiences his signature techniques at least once.[*]

47.     As the reach and scope of Jim's school has expanded, Jim has trained others to serve as instructors in his method. Jim selects those instructors from the pool of existing Certified Practitioners.[*]

48.     Instructors have some leeway in coordinating the logistics of courses with Jim's school, and they may have their own style of teaching. But at the end of the day, they teach the course materials and curricula provided by Jim's school.[*]

**Becky Tenges is committed to the Masterson Method.**

49.     Becky Tenges has been surrounded by horses since she was a kid.[*]

50.        Becky's father was a farrier—someone who trims and shoes horses' hooves. At one point, the ranch that she grew up on had over 100 horses.*

51.        After Becky left for college, she headed off to a career in business. But Becky knew that something else was calling; after twenty years, she returned to the animals she has always loved.*

52.        In pursuing her passion for horse care, Becky became a Certified Practitioner of the Masterson Method.*

53.        Once Jim recognized Becky's aptitude in the Masterson Method, he hand-picked her to serve as an instructor for his school.*

54.        Becky strongly believes in the Masterson Method. As time went on, her role with Jim expanded; from 2018 to 2023, she served as the Director of Fieldwork & Certification of Jim's school.*

55.        Becky has since stepped away from that role to focus on her own endeavors—she has founded knowledge and support networks for equine professionals, has her own consultancy, and still maintains a bodywork practice.*

56.        But through it all, she has remained a Masterson Method instructor. Even though she can no longer teach in Wisconsin, she has traveled to other states to teach the Masterson Method.*

57.        Becky is dedicated to Jim's method and is eager to teach it again in Wisconsin.*

8

**Wisconsin's Department of Safety and Professional Services tells Jim to stop offering his courses.**

58.    In March 2023, Becky was preparing to teach Jim's advanced five-day course in Wisconsin.[*]

59.    Jim's school had offered courses in Wisconsin before without issue.[*]

60.    But on March 22, 2023, Colleen Uhlenkamp, a School Administration Consultant with the Department, contacted Jim's school by email.[*]

61.    Uhlenkamp insinuated that Jim's school would need to undergo EAP's approval process—a process that Uhlenkamp described as "rigorous by design"—if the advanced five-day course was to be offered in Wisconsin.[*]

62.    Megan Dushin, who works for Jim's school, engaged in correspondence with Uhlenkamp. True and correct copies of that correspondence are included as Exhibits A and B.[*]

63.    During that correspondence, in an email on April 7, 2023, Uhlenkamp stated that Jim's school would "NEED to discontinue advertising for, recruiting, enrolling, or attempting to offer any training to Wisconsin residents." Uhlenkamp threatened to refer Jim's school to the Attorney General; she warned Megan that the Attorney General could impose $500-per-day fines on Jim's school for violations of the Act.[*]

64.    Jim's school removed advertising for all Wisconsin courses from Jim's website.[*]

65.    On April 9, 2023, Jim wrote to Uhlenkamp. A true and correct copy of their correspondence is contained at Exhibit C.[*]

66.    Jim informed Uhlenkamp that the Wisconsin courses had been taken off the website. He further maintained that Masterson Method courses are exempt from the Act because

the courses are "avocational or recreational in nature" and do not lead "to a vocational objective." Wis. Stat. § 440.52(1)(e)(4). Jim explained that his courses work to enhance horse-owners or equine professionals' relationships with their horses. And Jim also explained that even his certification process works to serve as an acknowledgement that the participants have demonstrated proficiency in Masterson Method techniques.[*]

67.     Jim concluded by inviting Uhlenkamp to an upcoming demonstration at the Midwest Horse Fair in Madison, Wisconsin.[*]

68.     Uhlenkamp did not budge. Instead, in an email sent the next day, she insisted that the advanced five-day course does not meet the avocational exception because the course is necessary for certification as a Certified Practitioner. Uhlenkamp stated that Jim was "invited to send [her] all documentation [he has] regarding program curriculum, student handbook, training materials, etc. to be further reviewed."[*]

69.     Uhlenkamp concluded her message by again threatening Jim's school with $500-per-day fines.[*]

70.     Jim wrote back on April 12 to seek clarification. He first reiterated to Uhlenkamp that advertising for all Wisconsin courses had been removed from the website. But while Uhlenkamp had taken issue with the advanced five-day course, Jim wondered whether his school would be able to offer more basic courses like his cornerstone weekend seminar.[*]

71.     Uhlenkamp replied, rephrasing her earlier request for additional documents as a demand: Jim was "still required to first send [Uhlenkamp] all documentation [he has] regarding program curriculum, student handbook, training materials, etc. for a compliance review."[*]

10

72.     Two days later, Jim sent the instructor outline and student workbook for his cornerstone weekend seminar. He also pointed out that both the cornerstone weekend seminar and the advanced five-day course are approved as continuing education courses by the National Certification Board for Therapeutic Massage and Bodywork.*

73.     On April 21, 2023, Uhlenkamp determined that Masterson Method courses are not avocational or recreational in nature. Thus, she concluded, Jim's school must undergo EAP approval if Masterson Method courses are to be taught in Wisconsin.*

**Wisconsin's regulatory scheme imposes incredible burdens on schools like Jim's.**

74.     The Department's position is that Jim's school is subject to the Act.

75.     The Act purports to regulate "schools"—the definition is broad, covering "any private trade, correspondence, business, or technical school," unless that school falls within a statutory exemption. Wis. Stat. § 440.52(1)(e).

76.     The Act exempts schools whose courses are primarily "avocational or recreational in nature" and do not lead "to a vocational objective." Wis. Stat. § 440.52(1)(e)(4).

77.     But Jim's school offers both avocational and vocational courses, so that exception does not apply.*

78.     That makes Jim's school subject to the Act.*

79.     The Act's requirements are onerous.*

80.     While the Act contains anti-fraud provisions, *see* Wis. Stat. § 440.52(7)(c), the scope of the Act goes well beyond any straightforward prohibition on fraud.

81.     After all, such a straightforward prohibition on fraud is already contained in Wisconsin's Deceptive Trade Practices Act, Wis. Stat. § 100.18(1).

11

82.     Instead, the Act goes further: it seeks to "encourage schools to maintain courses and courses of instruction consistent in quality, content, and length with generally accepted educational standards." Wis. Stat. § 440.52(7).

83.     To this end, the Act gives the Department an expansive mandate: the Department shall "inspect[] and approv[e]" the schools within the ambit of the Act, any changes in ownership or control of those schools, the schools' teaching locations, and the schools' courses of instruction, as well as solicitation of the schools' programs. Wis. Stat. § 440.52(2).

84.     Start with the regulation of "solicitors," people who "personally attempt[] to secure the enrollment of a student in the school." Wis. Stat. § 440.52(1)(f). If these "solicitors" want to advertise anywhere beyond "the actual business premises of the school," *id.* § 440.52(8)(a), they need a permit from the Department, *id.*; *accord id.* § 440.52(7)(h). Every year, those solicitors have to fill out an application and pay a fee. *Id.* § 440.52(8)(b). But schools also need to take out a $2,000 bond for each solicitor that they employ. *Id.* The Department can deny, revoke, or refuse to renew a solicitor's permit for a variety of reasons, including if the school refuses to submit to Department inspections or information requests, *id.* § 440.52(8)(c)(4), or if the school doesn't comply with the Department's approval requirements, *see id.* § 440.52(8)(c)(5). And if students are solicited by people who don't have a solicitors' permit, the school can't recover funds from those students. *Id.* § 440.52(8)(g). Violation of the provisions governing solicitors carries the threat of criminal penalties. *See id.* § 440.52(8)(h)-(i).

85.     The Act empowers the Department to "[i]nvestigate the adequacy of courses and courses of instruction offered by schools to residents of this state and establish minimum standards for those courses of instruction." Wis. Stat. § 440.52(7)(a).

86.	The Act empowers the Department to "[i]nvestigate the adequacy of schools' facilities, equipment, instructional materials, and instructional programs and establish minimum standards for those facilities, equipment, materials, and programs." Wis. Stat. § 440.52(7)(b).

87.	The Act empowers the Department to require that the schools furnish a surety bond. Wis. Stat. § 440.52(7)(i).

88.	The Act regulates the terms of contracts between schools and their students. Wis. Stat. § 440.52(7)(d)-(e).

89.	The Act requires that schools "furnish information concerning their facilities, curricula, instructors, enrollment policies, tuition and other charges and fees, refund policies, and policies concerning negotiability of promissory instruments received in payment of tuition and other charges." Wis. Stat. § 440.52(7)(f).

90.	But one power is at the heart of it all: the Department has approval power over "courses of instruction, schools, changes of ownership or control of schools, and teaching locations," Wis. Stat. § 440.52(7)(g), and it exercises that power from the get-go. That means that Jim's school must pay a fee, submit an application, be examined, and get approved *before* it can operate—or even advertise—in the state. *Id.* § 440.52(10)(a)-(c).

91.	With this bevy of mandates comes a vast delegation of rulemaking authority to the Department. Wis. Stat. § 440.52(3).

92.	In fact, the Act even delegates the development of criteria governing approval. Wis. Stat. § 440.52(10)(a)-(b).

93.	The Department has promulgated robust criteria governing all aspects of schools subject to the Act.

13

94.     A school must demonstrate that it is "in sound financial condition." Wis. Admin. Code SPS § 404.04(6).

95.     A school must also have "adequate space, suitable and sufficient equipment, and sufficient and appropriate instructional materials to carry out its program." Wis. Admin. Code SPS § 404.04(2).

96.     The Department imposes compliance with a separate set of refund policies. Wis. Admin. Code SPS § 404.04(4). The Department also requires that a school have "procedures to evaluate its educational programs, improve instruction and review overall operations," *id.* § 404.04(7)(a), and it requires that the school consider "student, alumni and employer feedback on the effectiveness of the curriculum," *id.* § 404.04(7)(b). In connection with these evaluation requirements, a school is further required to provide "annual enrollment information, using its definitions, delineating number of dropouts, completers, graduates and employed." *Id.* § 404.04(7)(c).

97.     The Department promulgates criteria for both the instruction of and the actual content of school offerings:

    a.   "The program, curriculum and instruction must be of such quality, content and length as may reasonably and adequately achieve the stated objective for which offered and comparable to similar programs in approved schools." Wis. Admin. Code SPS § 404.04(1)(a).

    b.   "The administrators and instructors of the school shall have suitable educational qualifications and experience, and be of good reputation and character." Wis. Admin. Code SPS § 404.04(1)(b).

14

c. "The school shall have a sufficient number of instructors to provide adequate student-teacher ratios." Wis. Admin. Code SPS § 404.04(1)(c).

d. "The school shall demonstrate that its instructors have the occupational, academic and teaching qualifications needed for the programs they teach." Wis. Admin. Code SPS § 404.04(1)(cm).

e. "The approval of programs, which are innovative and not comparable to currently approved private or public programs, shall be based on demonstrable quality and documented labor market needs, a description of the program development process and evidence of third-party review." Wis. Admin. Code SPS § 404.04(1)(d).

98. The Department has operationalized these "criteria" through a set of requirements that it imposes on the schools that submit for initial approval. According to EAP Form 1.11, this initial approval process requires that schools complete a litany of forms certifying that the school is in compliance with Department requirements.

99. A link to EAP Form 1.11 is included in paragraph 5 of Exhibit D, and a pdf copy of the relevant webpage is included as Exhibit E.

100. The requirements for initial approval are incredibly comprehensive:

a. Jim's school would have to detail the "[m]ission of the school." Wis. Admin. Code SPS § 404.03(1)(a). EAP Form 1.10, a link to which is included in paragraph 6 of Exhibit D, and with a pdf copy of the relevant webpage included as Exhibit F, requires Jim's school to describe its "mission and vision," or, in other words, "its purpose and core values." It requires that

15

Jim's school detail the "market" of the school, including how Jim's school is different from its "competitors." It requires Jim's school to engage in a detailed "strengths, weaknesses, opportunities and threats (SWOT)" analysis. And Form 1.10 also requires Jim's school to articulate the vision it has for itself in five years.

b. Jim's school would have to provide information on the "[b]ylaws and regulations established for the school's governance and operation." Wis. Admin. Code SPS § 404.03(1)(b).

c. Jim's school would have to give "[a] description of the degrees and programs offered, including learning outcomes." Wis. Admin. Code SPS § 404.03(1)(c). Jim's school would have to complete EAP Form 1.03, a link to which is included in paragraph 7 of Exhibit D, and with a pdf copy of the relevant webpage included as Exhibit G, for each program that it offers. Form 1.03 would require Jim's school to provide all kinds of information, from how courses will fit into the job market to what student-teacher ratios will be. The Form sets forth a set of criteria that reviewers are to use in assessing whether the program should be approved. These criteria scrutinize things like a course's syllabus, learning outcomes, and resources, but they go further than that. The criteria ask the reviewer to consider searching questions, like "[d]oes the program reflect present-day practice, meet current industry/occupational standards and prepare students for entry-level positions?"

16

d.  Jim's school would have to give a copy of the "document by which a student contracts to enroll in a school or program," Wis. Admin. Code SPS § 401.01(8); *see id.* § 404.03(1)(d), which must itself comply with a separate set of regulations, *id.* § 404.03(1)(d), including the cancellation-refund policy discussed below, *id.* § 406.01.

e.  Jim's school would have to give "[a] statement of its cancellation policy," which must comply with the Department's refund standards. Wis. Admin. Code SPS § 404.03(1)(e); *id.* §§ 408.01-.09. Jim's school would have to give every student a notice of cancellation provided in EAP Form 1.07, included as Exhibit H. And the Department's refund policies make it "the responsibility of the school, through pre-enrollment counseling, to make reasonably certain before enrollment is completed that the student has the ability to profit from the program under consideration." Wis. Admin. Code SPS § 408.01(2)(b). Jim's school would have to notify a prospective student who is "unlikely to qualify for employment in the vocation or field for which the training is designed to prepare a student," *id.* § 409.04(1), and would have to subsequently offer a full refund for its programs unless that student signed a separate written disclaimer, *id.* § 408.03(2). The standards also generally require that Jim's school offer a full refund if a student cancels within three business days of their acceptance into a program, *id.* § 406.03; *id.* § 408.03(1), and a partial, pro rata refund if a student cancels having completed less than 60% of the program, *id.* § 408.05.

17

f.  Jim's school would have to provide "[a] description of the school's placement services." Wis. Admin. Code SPS § 404.03(1)(f).

g.  Jim's school would have to provide "[a] copy of all advertising recently used or reasonably expected to be used in Wisconsin by the school." Wis. Admin. Code SPS § 404.03(1)(g).

h.  Jim's school would have to provide "[a] current balance sheet and income statement using department forms." Wis. Admin. Code SPS § 404.03(1)(h).

i.   Jim's school would have to take out "[a] surety bond," Wis. Admin. Code SPS § 404.03(1)(i), which must be at least $2,000 per solicitor employed by the school or $1,000 if the school engages no solicitors, *id.* § 404.06(1)(b), and which the regulations state should generally be "the lesser of $25,000 or 125% of unearned tuition," *id.* § 404.06(1)(a). EAP Form 1.02, a link to which is included in paragraph 9 of Exhibit D, and with a pdf copy of the relevant webpage included as Exhibit I, sets out how to calculate the amount of the bond owed.

j.  Jim's school would have to provide "[a] description of the school's location, buildings, and equipment," Wis. Admin. Code SPS § 404.03(1)(j), along with "[d]ocumentation that applicable fire, safety, and health codes are met at schools and teaching locations (except for public school buildings)." *id.* § 404.03(1)(L). Here, the definition of "teaching location" is broad: it is "the area and facilities, including any office, classroom, meeting room, laboratory, shop or range, used or designated for instructional use by a school." *Id.*

18

§ 401.01(29). A school must fill out EAP Form 1.08, a link to which is included in paragraph 10 of Exhibit D, and with a pdf copy of the relevant webpage included as Exhibit J, for each teaching location. In addition to requiring a description of the teaching location, including the purpose and age of the building, Form 1.08 requires that the school submit a Certificate of Occupancy and a Fire Inspection Report completed within the past six months.

k.  Jim's school would have to provide "[a] list of faculty members indicating their education, preparation and experience." Wis. Admin. Code SPS § 404.03(1)(k). A school must fill out EAP Form 1.04, a link to which is included in paragraph 11 of Exhibit D, and with a pdf copy of the relevant webpage included as Exhibit K, for every instructor that it employs.

l.  Jim's school would have to provide a "school catalog or bulletin[.]" Wis. Admin. Code SPS § 404.03(2). That bulletin must include "[a] mission statement," *id.* § 404.03(2)(d), school policies "regarding attendance, leave, absences, tardiness, standards of progress policy, grading policy, rules of conduct and a policy for handling student complaints," *id.* § 404.03(2)(f), "[a] description of the school's self-evaluation process," *id.* § 404.03(2)(g), and "[a] description of the school's placement services," *id.* § 404.03(2)(i). This regulation is operationalized through EAP Form 1.05, a link to which is included in paragraph 12 of Exhibit D, and with a pdf copy of the relevant webpage included as Exhibit L, which requires assessment of the school catalog against a checklist containing more than 60 items.

m. Jim's school must also provide "[a]ny other information" that the Department might want in evaluating the school. Wis. Admin. Code SPS § 404.03(1)(n).

101. The Department gets to determine whether the information a school submits pursuant to these requirements meets the Department's criteria. Wis. Admin. Code § 404.01(2m).

102. On information and belief, this initial approval process takes months.

103. But the burden doesn't end with initial approval. Initial approval only lasts for one year, Wis. Stat. § 440.52(10)(a); *see also* Wis. Admin. Code SPS § 404.10(2)(a), and already-approved schools must go through a reapproval process each year, *id.* § 404.01(4).

104. Thus, "[a]ll approved schools shall submit quarterly reports, including information on enrollment, number of teachers and their qualifications, course offerings, number of graduates, number of graduates successfully employed, and such other information as the department considers necessary." Wis. Stat. § 440.52(10)(a). For an example of the ongoing reporting that a school must engage in, EAP Form 2.05 requires, on information and belief, that a school report, on a yearly basis, past students' employers and their current positions. EAP Form 2.05 is included as Exhibit M.

105. There are also intermediate reporting obligations: already-approved schools must also "immediately report any significant changes in its program, facilities, finances or personnel." Wis. Admin. Code SPS § 404.01(2).

106. And there are inspection requirements. EAP Form 2.03, which is included as Exhibit N, and which Department examiners may use to guide their site visits, indicate that these

inspections can extend to an assessment of everything from whether a school's "mission drive[s] program development . . . and institutional self-improvement," to whether teaching locations comply with local fire codes.

107.    The Department also requires schools to "keep records of attendance, progress and grades," Wis. Admin. Code SPS § 407.01, and to retain those and other records for six years after a student has attended the school, *id.* § 407.02.

108.    There are fees to be paid all along the way. As a baseline, the fees are generally calibrated to fund the operations of EAP. *See* Wis. Stat. § 440.52(10)(c)(1). There are fees for initial approval. Wis. Admin. Code SPS § 404.10(1). Fees for yearly renewal of approval—both on a fixed and percentage basis. *Id.* § 404.10(2). Fees for new or revised programs. *Id.* § 404.10(3). Fees for approval of teaching locations. *Id.* § 404.10(4). Fees for when the ownership or control of a school changes.  *Id.* § 404.10(5). Fees for amending an application. *Id.* § 404.10(6). And there is a student protection fee that is assessed based on the adjusted gross revenue of a school. *See id.* § 404.06(2); *see also* Wis. Stat. § 440.52(c)(4), (cm).

109.    The sum of the parts is an incredibly burdensome process that foists steep initial and ongoing costs of compliance, even before factoring in the thousands of dollars that are actually charged in fees.

110.    Schools must comply, or else. Contracts can be voided, Wis. Stat. § 440.52(8)(g), and approvals can be denied or revoked, Wis. Admin. Code SPS § 404.01(2m)(a), (5).

111.    And those who fail to comply with the statute risk $500-per-day penalties or even criminal prosecution. Wis. Stat. § 440.52(8)(i), (10)(e).

112.     This is what the Department would require of Plaintiffs, just because they want to teach willing students in Wisconsin.

**The Act's extensive burdens on Plaintiffs' freedom of speech ensure that Plaintiffs will continue to suffer injury and irreparable harm.**

113.     For years, Jim and instructors like Becky have taught the Masterson Method all over the world. They've taught it to willing students, and those students have left with greater knowledge of Jim's signature method.[*]

114.     Teaching Jim's signature method is protected speech under the First Amendment.

115.     Jim's school offers certifications, so it is subject to the Act.[*]

116.     Plaintiffs want to exercise their constitutional rights. They want to teach Jim's signature method to willing students in Wisconsin. But they can't unless they comply with the Act.

117.     Requiring Plaintiffs to comply with the Act before they can teach Jim's signature method in Wisconsin is a prior restraint on speech. That violates the First Amendment.

118.     And the Act imposes burdens so extreme that compliance is infeasible for Jim's school.[*]

119.     Compliance with the Act would require Jim's school to waste substantial time and resources preparing to undergo the Department's months-long initial approval process.[*]

120.     Compliance with the Act would require Jim's school to waste substantial time and resources preparing market studies, strategic plans, and "SWOT" analyses. Jim's school has operated just fine—indeed, it has grown substantially—without any of these things.[*]

121.      Compliance with the Act would require Jim's school to waste substantial time and resources overhauling the policies, procedures, and basic contracts it already uses.*

122.      Compliance with the Act would require Jim's school to waste substantial time and resources developing a school catalog that conforms to the Department's 60-plus-item checklist.*

123.      Compliance with the Act would require Jim's school to procure a surety bond of thousands of dollars.*

124.      Compliance with the Act would require Jim's school to waste substantial time and resources to chase down barns that volunteer to host Masterson Method courses for documentation about their buildings. That doesn't just burden Plaintiffs; it burdens the barns. And it would require Jim's school to change its business model—a single offering of the advanced five-day course is often conducted at five separate host barns.*

125.      Compliance with the Act would require Jim's school to pay calibrated fees to fund the administration of an unconstitutional statute.*

126.      Compliance with the Act would require Jim's school to waste substantial time and resources complying with the Department's ongoing requirements for maintaining approval.*

127.      Compliance with the Act would cause Jim's courses—which teach *his* signature method—to be subject to the upvote or downvote of Department bureaucrats who, on information and belief, are ill-qualified to opine on performance animal care generally, let alone Jim's signature method specifically. Those bureaucrats are, on information and belief, similiarly ill-equipped to opine on the credentials of Jim's instructors, who Jim has selected based on an assessment of their proficiency in his signature method.*

128.     More time and resources spent complying with the Act means less time and resources spent conducting courses, whether in Wisconsin or elsewhere. Less time spent conducting courses means that instructors like Becky have fewer opportunities to engage in constitutionally protected speech, and Jim has fewer opportunities to propagate his constitutionally protected message.[*]

129.     The Act's extensive delegation to the Department has contributed to the Act's crushing burdens. But the Act can't be fixed just by narrowing the delegation. The Act itself—with its many mandates, its onerous requirements—substantially burdens Plaintiffs' speech and is unconstitutional.

130.     But for the Act, Plaintiffs would teach Wisconsin residents the full range of courses offered by Jim's school without fear of government intrusion or retribution at the hands of Defendants.[*]

131.     Presently, however, Plaintiffs' protected speech is chilled by the credible threat of monetary or criminal sanctions.[*]

132.     If this Court enjoined Defendants from implementing and enforcing the Act, Plaintiffs would be relieved of this credible threat of sanctions, and they would no longer fear government intrusion or retribution at the hands of Defendants. They would be free to teach—and would resume teaching without delay—the full range of courses offered by Jim's school to willing students in Wisconsin.[*]

133.     If this Court declared that the Act is unconstitutional as applied to anyone who desires to teach vocational skills to willing students for a fee, the declaration would conclusively

determine that Plaintiffs could teach vocational skills—including Jim's school's certifications—to students who wish to learn.\*

134.    If this Court declared that the statute is unconstitutional as applied to Plaintiffs—as well as to other instructors who wish to teach Jim's signature method—Plaintiffs would no longer fear Defendants' implementation and threatened enforcement of the Act.\*

135.    Without such relief, Plaintiffs will continue to face ongoing harm to their constitutional rights.\*

**The Act lacks a constitutionally sufficient justification.**

136.    On information and belief, Defendants do not have a compelling or sufficiently important justification for infringing on Plaintiffs' constitutional right to teach skills—like Jim's signature method—to willing students.\*

137.    On information and belief, Defendants have no evidence that anyone is or has ever been harmed by the fact that Jim's school offers courses in Jim's signature method, no matter whether those courses are vocational or otherwise. Nor, on information and belief, do they have evidence that anyone has ever even complained to regulators or organizations like the Better Business Bureau about the courses offered by Jim's school, vocational or otherwise.\*

138.    On information and belief, Defendants cannot demonstrate that the Act advances any legitimate purpose that would not be equally well advanced by a less-burdensome system of private or voluntary certification, or the enforcement of existing direct prohibitions on fraud.\*

139.    On information and belief, Defendant has no evidence of harms that would arise if Jim's school did not need to satisfy the Act's requirements.\*

140.     What's left is the very kind of paternalistic overregulation that the First Amendment protects against.

## CLAIM

### First Amendment – Declaratory and Injunctive Relief

141.     Plaintiffs incorporate and re-allege each allegation contained in Paragraphs 1 through 140.

142.     Plaintiffs have a right to engage in speech under the First Amendment to the U.S. Constitution, as applied to the states through the Fourteenth Amendment.

143.     Teaching is speech, whether or not the teacher charges a fee.

144.     Teaching is speech, whether or not what the teacher is teaching is vocational training.

145.     So teaching Jim's signature method of animal care is protected speech. That's true whether or not Plaintiffs charge a fee to those students. And it's true whether or not those students go on to seek any of the certifications offered by Jim's school.

146.     Plaintiffs want to teach Jim's signature method of animal care to willing students in Wisconsin.

147.     But the Department's position is that if Plaintiffs can speak, they have to comply with the Act. That's an unconstitutional prior restraint.

148.     And the Act places substantial burden on those—like Plaintiffs—who wish to teach skills to willing students.

149.     On its face and as applied to Plaintiffs, those substantial burdens are directly targeted at the provision of spoken training to others.

150. The Act draws content-based distinctions on its face. A school providing instruction that is "avocational or recreational in nature and not leading to a vocational objective" will be exempt from approval under the Act. Wis. Stat. § 440.52(1)(e)(4).

151. To determine whether a school provides instruction that is "avocational or recreational in nature and not leading to a vocational objective," the Department must examine the content of that instruction's message.

152. And that's exactly what the Department does. Take what happened here: Uhlenkamp examined the content of the message delivered in Jim's cornerstone weekend seminar, even before the formal approval process.

153. The Act is also content-based because it cannot be justified without reference to the content of the speech at issue. The Act's supposed purpose is to regulate the quality—that is to say, the content—of teaching in the state of Wisconsin.

154. So the Act discriminates between the content of messages, both on its face, in its purpose, and in its application.

155. And the Act's substantial burdens on speech go well beyond any mere disclosure of factual information.

156. It follows that the Act is presumptively unconstitutional; the Act can only be justified if Defendants demonstrate that it is the least restrictive means to achieve a compelling governmental interest that is based on real fact, not mere conjecture.

157. Such an interest would have to be based on real facts rather than mere conjecture or speculation.

158.    But, on information and belief, Defendants cannot show that enforcing the Act against Plaintiffs will actually advance an important governmental interest, let alone a compelling governmental interest.

159.    Even if Defendants have a compelling interest that isn't just based on mere conjecture or speculation, the Act itself isn't the least-restrictive means to carry out that interest.

160.    Just look at some of the goals referenced by the statute.

161.    The Act purportedly seeks to "prevent fraud and misrepresentation in the sale and advertising of courses and courses of instruction." Wis. Stat. § 440.52(7).

162.    But Wisconsin already has direct prohibitions on fraud. *See* Wis. Stat. § 100.18(1); *id.* § 943.20(1)(d). Defendants cannot demonstrate that this alternative would not adequately serve this or any other interest.

163.    And the Act purportedly seeks to "encourage schools to maintain courses and courses of instruction consistent in quality, content, and length with generally accepted educational standards." Wis. Stat. § 440.52(7).

164.    But Defendants cannot demonstrate that a voluntary or private accreditation system would not adequately serve this interest. For example, Jim's advanced five-day course—the one Wisconsin cared so much about in the first place—is approved for continuing education credits by the National Certification Board for Therapeutic Massage and Bodywork. Wisconsin could also implement an *opt-in* accreditation system that encourages the people of Wisconsin to patronize accredited schools but which does not prevent unaccredited schools from operating.

165.    Even if the Act burdened speech only incidentally—here a counterfactual because the Act is directly targeted at the provision of training to others—it would still be

28

unconstitutional. Defendants would still have the burden of demonstrating that the law does not burden substantially more speech than is necessary to further a substantial interest that is based in fact rather than conjecture.

166.    Preventing Plaintiffs from teaching the Masterson Method—an internationally-known method of animal care—to students willing to learn works to burden far more speech than is necessary to serve an important governmental interest.

167.    Unless Defendants' implementation and enforcement of the Act is declared unconstitutional and enjoined, Plaintiffs will continue to suffer irreparable harm to their constitutionally-protected right to teach students in Jim's signature method.

168.    These ongoing harms cannot be remedied by damages or other retrospective relief.

## REQUEST FOR RELIEF

As remedies for the constitutional violations just described, Plaintiffs respectfully request the following relief:

A. Entry of judgment declaring that Wis. Stat. § 440.52, the regulations promulgated thereunder, or any Departmental policy or procedure adopted thereto is unconstitutional in violation of the First Amendment;

B. Entry of a permanent injunction enjoining Defendants from implementing or enforcing Wis. Stat. § 440.52, Wis. Admin. Code SPS § 401.01, *et seq.*, or any other law, regulation, or administrative practice or policy related to Wisconsin's Educational Approval Program, on their face and as applied to Plaintiffs;

C.   Entry of a preliminary injunction enjoining Defendants from implementing or enforcing Wis. Stat. § 440.52, Wis. Admin. Code SPS § 401.01, *et seq.*, or any other law, regulation, or administrative practice or policy related to Wisconsin's Educational Approval Program against Plaintiffs.

D.   An award of attorneys' fees, costs, and expenses in this action pursuant to 42 U.S.C. § 1988;

E.   Such further legal and equitable relief as the Court may deem just and proper.

Respectfully submitted this 21st day of April, 2026.

/s/ Joseph S. Diedrich
Joseph S. Diedrich
WI Bar No. 1097562
HUSCH BLACKWELL LLP
511 North Broadway, Ste. 1100
Milwaukee, WI 53202
Phone: (414) 978-5425
Email: joseph.diedrich@huschblackwell.com

/s/ Jeffrey H. Redfern
Jeffrey H. Redfern
Minnesota Bar No. 1018046
DC Bar No. 1018046
Prashanta G. Augustine
NY Bar No. 6256531
INSTITUTE FOR JUSTICE
901 N. Glebe Rd., Ste. 900
Arlington, VA 22203
Phone: (703) 682-9320
Email: jredfern@ij.org; paugustine@ij.org
*Attorneys for Plaintiffs*

**VERIFICATION**

I, James ("Jim") Masterson, declare as follows:

1.  I am a Plaintiff in the above-captioned action.

2.  I am the founder, co-owner (along with my wife), and Chief Executive Officer of The Masterson Method, Inc., an Iowa corporation headquartered in Iowa, also a Plaintiff in the above-captioned action.

3.  I have read the foregoing Verified Complaint and know the contents thereof.

4.  The facts contained in the foregoing Verified Complaint, specifically those set forth in Paragraphs 5 through 7, 16 through 48, 53 through 56, 58 through 73, 77 through 78, 113, 115, 118 through 128, and 130 through 139, are true and correct to my own knowledge, and to my knowledge as Chief Executive Officer of Masterson Method, Inc., except (1) those matters stated to be alleged on information and belief, which I reasonably believe to be true, and (2) matters that pertain exclusively to Plaintiff Rebecca Tenges. This verification does not extend to legal conclusions or legal theories, and where a paragraph contains statements that could be construed as either legal or factual, or a mix of both, this verification extends only to the factual components of the statement.

5.  I declare under penalty of perjury that the foregoing is true and correct.

*[rest of page intentionally blank]*

_James Masterson_
James Masterson (Apr 19, 2026 11:32:59 CDT)
James Masterson

Executed on April 19, 2026 [date], at Fairfield, IA [city, state].

_James Masterson_
James Masterson (Apr 19, 2026 11:32:59 CDT)
The Masterson Method, Inc.

Name: James Masterson

Title: Owner-CEO

Executed on April 19, 2026 [date], at Fairfield, IA [city, state].

**VERIFICATION**

I, Rebecca ("Becky") Tenges, declare as follows:

1.  I am a Plaintiff in the above-captioned action.

2.  I have read the foregoing Verified Complaint and know the contents thereof.

3.  The facts contained in the foregoing Verified Complaint, specifically those set forth in Paragraphs 8, 17, 29, 34, 36 through 38, 40, 42 through 43, 47, 49 through 57, 58 through 59, 79, 128, and 130 through 135, are true and correct to my own knowledge, except (1) those matters stated to be alleged on information and belief, which I reasonably believe to be true, and (2) matters that pertain exclusively to Plaintiffs James Masterson and The Masterson Method, Inc. This verification does not extend to legal conclusions or legal theories, and where a paragraph contains statements that could be construed as either legal or factual, or a mix of both, this verification extends only to the factual components of the statement.

4.  I declare under penalty of perjury that the foregoing is true and correct.

*Rebecca Tenges*
Rebecca Tenges (Apr 19, 2026 11:30:44 CDT)
_____
Rebecca Tenges

Executed on __4/19/26_____ [date], at __Cedarburg, WI_____[city, state].

33