IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JAMES MASTERSON, REBECCA
TENGES, and THE MASTERSON
METHOD, INC.,

       Plaintiffs,

       v.                       Case No. 26-cv-365-wmc

DAN HERETH, in his official capacity as
public official of Wisconsin's Department
of Safety and Professional Services and
JOSH KAUL, in his official capacity as
Wisconsin's Attorney General,

       Defendants.

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

## INTRODUCTION

Plaintiffs—an equine bodywork school called The Masterson Method, Inc., its owner, Jim Masterson, and a teacher—seek a preliminary injunction enjoining Wisconsin's Educational Approval Program, which regulates private career schools statewide. Three years ago, the Wisconsin program determined that Masterson must obtain approval and did not qualify for an exemption for avocational and recreational schools. Masterson contends that the Wisconsin

program burdens his ability to teach his signature method of equine care, which is protected speech under the First Amendment.

Masterson's preliminary injunction motion should be denied because he fails to satisfy the requirements for preliminary relief. First, Masterson has no reasonable likelihood of success on the merits of his claim. His claim is unripe because it is premised on an outdated determination by the department. And the Wisconsin program is a professional regulation that does not impermissibly burden Masterson's protected speech. Second, Masterson will not suffer irreparable harm absent a preliminary injunction. He has repositioned the focus of his school from career preparation to personal enrichment—and is permitted to teach his method through avocational classes in Wisconsin. Finally, the balance of equities and the public interest weigh against the issuance of a preliminary injunction.

Although Masterson seeks only as-applied preliminary relief, he brings a facial challenge as well. Fundamentally, this case is about more than Masterson's ability to teach equine massage in Wisconsin; it contests the state's ability to regulate private career schools across the board. The motion for preliminary relief should be denied.

## BACKGROUND AND STATEMENT OF FACTS

### I.    Wisconsin's Educational Approval Program

The Wisconsin Department of Safety and Professional Services is an executive branch agency of state of Wisconsin. Wis. Stat. § 15.40. Its mission is to promote economic growth and stability while protecting the public health and welfare of Wisconsin residents by regulating state businesses, professions, and industries. (Gage Dec. ¶¶ 3–4.)

The department regulates private, trade, and technical schools through its Educational Approval Program, established under Wis. Stat. § 440.52. The department is statutorily required to "protect the general public" by inspecting and approving private trade, correspondence, business and technical schools; approving changes in ownership and control over schools; approving teaching locations and courses of instruction; and regulating how schools solicit students. Wis. Stat. § 440.52(2).

To carry out its duties, the department is statutorily required to "promulgate rules and establish standards necessary to administer" the Wisconsin program. Wis. Stat. § 440.52(2). To that end, the department has issued administrative rules establishing an approval process and standards for private career school operations—including sales and advertising, fraud prevention, educational facilities and classrooms, curricula, instructors,

enrollment policies, tuition, refunds, other payment policies, and more. Wis. Admin. Code SPS ch. 400, *et seq*.

The Wisconsin program's mandate is to protect students from fraud and misrepresentation in educational advertising, to safeguard students financially, and to encourage schools to maintain quality programming that is consistent with educational standards. Wis. Stat. § 440.52(7). The Wisconsin program provides critical consumer protections to Wisconsin students who seek to attend private, technical, and trade schools to advance their careers. *Id.;* (Gage Dec. ¶¶ 6–13.)

## II.    Private and career schools subject to the approval program

Wisconsin law provides that no school subject to the program may operate, do business, offer courses, advertise, or enroll students until it has obtained program approval. Wis. Admin. Code SPS § 404.01(1). "School" is defined as "any private trade, correspondence, business, or technical school." Wis. Stat. § 440.52(1)(e).

The statute enumerates ten exemptions to the Wisconsin program. *See* Wis. Stat. § 440.52(1)(e)(1)–(10). The statute applies to professional training programs, and so one exception exempts avocational schools: "Schools primarily offering instruction avocational or recreational in nature and not leading to a vocational objective." Wis. Stat. § 440.52(1)(e)(4). Other exemptions include courses offered by employers to their employees, schools

4

supported mainly by taxes, and schools regulated by state agencies or boards other than the department. Wis. Stat. § 440.52(1)(e). A school does not need to be located in Wisconsin to be subject to the program. Wis. Stat. § 440.52(2).

To obtain Wisconsin program approval, a school must complete a thorough application process and meet approval criteria. Wisconsin Admin. Code SPS § 404.03 lists the application requirements. A school's application must include its mission, bylaws and regulations for governance, faculty information, information about the degrees and programs offered, copies of student enrollment agreements, financial information, advertising materials, and a surety bond, among other things. Wis. Admin Code SPS § 404.03(2). A school must also submit a course catalogue containing an academic calendar, mission statement, educational program information, tuition schedule, and attendance policies. Wis. Admin. Code SPS § 404.03(2).

Wisconsin Admin. Code SPS § 404.04 establishes criteria for approval. For example, the quality, content and length of a school's educational programming must be adequate to achieve the school's stated educational objectives, and similar to other approved programs. Wis. Admin. Code SPS § 404.04(1)(a). Instructors and administrators must be qualified. Wis. Admin. Code SPS § 404.04(1)(b) and (cm). The school must have adequate facilities; meet fair advertising standards; offer appropriate refund policies; and

establish procedures to evaluate and maintain its educational outcomes. Wis. Admin. Code SPS § 404.04.

### III. The department's 2023 vocational determination.

On March 20, 2023, a Minnesota-based equine bodywork business contacted and informed the department that Masterson was offering classes in Wisconsin without program approval. (Uhlenkamp Dec. ¶ 5.) The email pointed out that Masterson was planning to offer two "Advanced 5-Day Courses" in West Bend, Wisconsin, from July 10 to 14, 2023, and October 16 to 20, 2023. (Uhlenkamp Dec. ¶ 7.)

The department is authorized to "investigate any school and its programs upon receipt of a complaint from an interested person." Wis. Admin. Code SPS § 404.08(2). The Wisconsin program reviewed Masterson's website and determined it needed additional information from Masterson to review applicability. (Uhlenkamp Dec. ¶ 7.) At the time, Masterson advertised a four-step practitioner certification program described to prepare students for "professional equine bodywork" and a horse-related "vocation." (Uhlenkamp Dec. ¶¶ 18–19; *see also* Hipsman Dec. Ex. B.) The "Advanced 5-Day Courses" was a required step in the certification program. (Uhlenkamp Dec. ¶ 19.) The website also listed all certified practitioners worldwide and listed their business contact information. (Hipsman Dec. Ex. D.)

The Wisconsin program emailed Masterson to explain the program and its requirements. (Uhlenkamp Dec. ¶ 8.) Over the next two weeks, the Wisconsin program and Masterson exchanged emails and information to determine Masterson's status. (Uhlenkamp Dec. ¶¶ 8–22.) The department received a second report on April 7, 2023, that Masterson was offering equine bodywork classes without program approval. (Uhlenkamp Dec. ¶ 11.)

Given the external complaints and the Wisconsin program's concerns, the program instructed Masterson to discontinue advertising for, recruiting, enrolling, or attempting to offer training to Wisconsin residents until the school's status was resolved. (Uhlenkamp Dec. ¶ 12.) The Wisconsin program and Masterson continued to exchange communications and materials. (Uhlenkamp Dec. ¶¶ 13–17.)

On April 21, 2023, the Wisconsin program notified Masterson that it had reviewed Masterson's submitted materials, public website, and social media materials, and determined that its programs were not avocational or recreational. (Uhlenkamp Dec. ¶ 21.) The Wisconsin program explained that Masterson's programs were "being offered and marketed to therapists and trainers who would utilize the materials learned from the program for occupational purposes." (Hipsman Dec. Ex. J.) The next day, April 22, 2023, Masterson informed the department that it would work to comply with Wisconsin law. (Uhlenkamp Dec. ¶ 22.) The department received no further

communication from Masterson until being served with the summons and complaint in this lawsuit. (Uhlenkamp Dec. ¶ 23.)

**IV.    Masterson's website today.**

Today, Masterson's website no longer states that its courses will result in equine professional or vocational qualifications. (Hipsman Dec. Exs. E–G.) Rather, it describes the certified practitioner program as instruction solely that will "make a difference in the horse's performance, comfort, well-being, and relationship with its human partner," and allow students to develop skills to improve their horse's performance; communicate and connect with the horse; increase personal knowledge; and become a better horse person. (Gage Dec. ¶ 32; Hipsman Dec. Ex. 5.)

## LEGAL STANDARD

A preliminary injunction is an extraordinary and drastic remedy and is not awarded as a matter of right. *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008); *Boucher v. Sch. Bd. of the Sch. Dist. of Greenfield*, 134 F.3d 821, 823 (7th Cir. 1998). It is a "very far-reaching power, never to be indulged in except in a case clearly demanding it." *Cassell v. Snyders*, 990 F.3d 539, 544 (7th Cir. 2020) (quoting *Orr v. Shicker*, 953 F.3d 490, 501 (7th Cir. 2020)).

The moving party bears the burden to show that such extraordinary relief is warranted. *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018). The moving party must be able to show that it is likely to

succeed on the merits and that it would suffer irreparable harm absent the injunction. *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 539 (7th Cir. 2021). If the moving party cannot meet these threshold requirements, "the court 'must deny the injunction.'" *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019) (citation omitted).

If the moving party satisfies each of the threshold requirements, the court weighs the harm of denying the injunction to the moving party against the harm of granting the injunction. *Life Spine, Inc.*, 8 F.4th at 539. Finally, "a party requesting a preliminary injunction must generally show reasonable diligence." *Benisek v. Lamone*, 585 U.S. 155, 159 (2018). When balancing the equities, a moving party's unnecessary delay in requesting a preliminary injunction will weigh against their request. *Id.* at 160.

## ARGUMENT

### I. Masterson is not likely to succeed on the merits of his First Amendment free speech claim.

To demonstrate a likelihood of success, the movant "must make a strong showing" that they are likely to succeed on the merits. *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020). A "better than negligible chance" of success is not enough. *Id.* at 763 (quotations omitted). The movant must demonstrate how they will prove the key elements of their case. *Id.* Here, Masterson has no reasonable likelihood of success on the merits of his First

Amendment claim. This case does not present a ripe controversy that is fit for review, and he does not demonstrate that the Wisconsin program unconstitutionally burdens speech under the First Amendment.

**A. Masterson's challenge does not present a ripe controversy.**

Masterson's as-applied challenge to the Wisconsin program fails out of the gate because it does not present a ripe controversy. Ripeness is a component of the case-or-controversy requirement for Article III justiciability. *Amling v. Harrow Indus. LLC*, 943 F.3d 373, 377 (7th Cir. 2019). The ripeness doctrine mandates that federal courts do not issue advisory opinions about theoretical disputes or policy disagreements. *Wisconsin's Env't Decade, Inc. v. State Bar of Wis.*, 747 F.2d 407, 410–11 (7th Cir. 1984). This means that "a claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (quotation and citation omitted).

When considering a case's fitness for review, courts consider "the degree and nature of the regulation's present effect on those seeking relief." *Toilet Goods Ass'n., Inc. v. Gardner*, 387 U.S. 158, 164 (1967). Federal courts "normally do not entertain pre-enforcement challenges." *AT&T Corp. v. Iowa Utilties Bd.*, 525 U.S. 366, 386 (1999). If the plaintiff is unable to show any threat that the challenged action will be enforced against him or her, the case is unripe. *Wisconsin's Env't Decade, Inc.*, 747 F.2d at 411; *Democratic Nat'l*

*Comm. v. Bostelmann*, 466 F. Supp. 3d 957, 964 (W.D. Wis. 2020) (a lawsuit may be unripe when "enforcement is in some reasonable doubt".)

Masterson might have been able to present a live case or controversy three years ago, but he cannot today. The department's determination that Masterson was not subject the avocational exception was based on Masterson's materials at that time. (Uhlenkamp Dec. ¶ 19.) In 2023, Masterson's website and social media advertising and marketing materials emphasized the vocational objectives of its certified practitioner program. (Uhlenkamp Dec. ¶ 19; Hipsman Dec. Exs. A–D (stating the certification program is a "high quality training program that will prepare you to become a professional equine bodyworker," is "[f]or those who want to start their own Masterson Method equine bodywork business," and listing several reasons for obtaining a certification, including "to have a vocation where you're giving back to the horse," and "to develop skills as a professional equine bodyworker").)

Masterson's website no longer promotes vocational and professional benefits. (Gage Dec. ¶¶ 32–35.) The current description of the certification program focuses on personal fulfillment, stating that the certification is designed to make a difference in the horse's life and relationship with its human partner, improve horse performance, help humans communicate and connect with their horse, increase their personal knowledge, and become a better horse person. (Gage Dec. ¶¶ 32–35; Hipsman Dec. Exs. E–G.) Since this

11

shift in positioning, Masterson has not contacted the department to see if the school is now exempt as avocational. But based on his current website, it appears that Masterson offers only avocational and recreational instruction without vocational objectives. (Gage Dec. ¶ 34.) As long as Masterson offers only avocational instruction, he may teach his method of equine massage in Wisconsin without approval. (Gage Dec. ¶ 35.)

Therefore, there is no live determination that Masterson's courses are currently subject to the Wisconsin program. A controversy that was live in the past is not sufficient to confer justiciability. *Burke v. Barnes*, 479 U.S. 361, 363 (1987). And past exposure to the challenged conduct, and a plaintiff's speculation that he may suffer the same injury at some time in the future, is not enough. *Tobin for Governor v. Ill. State Bd. of Elections*, 268 F.3d 517, 528 (7th Cir. 2001). There is also no concrete conflict premised on Masterson's advertising because he does not state that he wishes to return to promoting vocational and business benefits or assert that the current business model in any way limits his ability to teach its full range of courses. If a plaintiff is unable to show any threat that the challenged action will be enforced against him or her, the case should be dismissed as unripe. *Wisconsin's Env't Decade, Inc.*, 747 F.2d at 411.

If, in the future, Masterson seeks the exemption and is rejected, a controversy will exist. But for now, the "position of the defendants and

the rights of the plaintiff are not yet in fixed, final form." *Lister v. Lucey*, 575 F.2d 1325, 1335 (7th Cir. 1978). Masterson's challenge is not ripe for review.

### B. Masterson's First Amendment claim does not have a strong likelihood of success on the merits.

Masterson cannot make a strong showing that he is likely to succeed on the merits of his First Amendment claim. He contends that the Wisconsin program targets his speech and is a content-based restriction that does not survive strict scrutiny. That is incorrect. The Wisconsin program is a professional regulation subject to intermediate scrutiny, a test it easily passes. And it draws no content-based distinction that singles out Masterson for what he is teaching.

#### 1. The First Amendment treats speech differently than conduct; intermediate scrutiny applies to activities involving both.

The First Amendment states that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. When applying the First Amendment, courts distinguish between laws that burden speech and laws that burden conduct. *Richwine v. Matuszak*, 148 F.4th 942, 953 (7th Cir. 2025). The distinction is important because it determines what level of judicial scrutiny applies to the challenged law.

Laws that burden only conduct receive no First Amendment protection and are presumed to be constitutional. *Id.* This is because "most conduct carries no expressive meaning of First Amendment significance." *Schultz v. City of Cumberland*, 228 F.3d 831, 841 (7th Cir. 2000); *Foxxxy Ladyz Adult World, Inc. v. Vill. of Dix*, 779 F.3d 706, 719 (7th Cir. 2015) (when a law does not reach expressive conduct, any regulation of that conduct must simply be reasonable.). A law need only be rationally related to a legitimate government interest to overcome rational basis review. *Id.*

In contrast, laws that burden pure speech are subject to heightened First Amendment scrutiny. *Richwine*, 148 F.4th at 953. This protection also extends to certain types of "symbolic or expressive conduct." *The Bail Project, Inc. v. Comm'r, Ind. Dep't of Ins.*, 76 F.4th 569, 575 (7th Cir. 2023). Laws that infringe pure speech are subject to strict scrutiny and are presumptively invalid. *Richwine*, 148 F.4th at 953. The law must be narrowly tailored to advance a compelling government interest. *Ent. Software Ass'n v. Blagojevich*, 469 F.3d 641, 646 (7th Cir. 2006).

Intermediate scrutiny, a middle ground between strict and rational basis review, applies in limited First Amendment contexts. It is well-established that the First Amendment "does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011). This includes regulation of professional conduct.

14

On one hand, states have broad power to regulate the practice of professions and industries within their boundaries. *Goldfarb v. Va. State Bar*, 421 U.S. 773, 792 (1975). On the other hand, professional expression is entitled to First Amendment protection. *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 777 (2018) (*NIFLA*). Intermediate scrutiny strikes a balance between state regulatory powers and individual rights. *Cap. Associated Indus., Inc. v. Stein*, 922 F.3d 198, 209 (4th Cir. 2019). Laws "regulating conduct in ways that incidentally sweep in speech" are constitutional if they serve an important government interest. *Chiles v. Salazar*, 146 S. Ct. 1010, 1022 (2026).

To determine which level of scrutiny applies, a court may look at what "[triggers] coverage under the statute," and whether it "consists of communicating a message" or is "noncommunicative conduct." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 27–28 (2010).

### 2. Strict scrutiny applies to regulations that compel or prohibit specific professional speech

Masterson contends that the Wisconsin program bans his professional speech and restricts him from teaching his method of equine care. (Dkt. 3:19–20.) This broad approach is conceptually wrong, and it is unsupported by the Supreme Court's recent cases on professional regulations and the First Amendment.

In *NIFLA*, the Supreme Court clarified the status of the First Amendment protections available to professional speech. The court rejected professional speech as a unique category of speech that is automatically exempt from strict scrutiny. 585 U.S. at 768. But *NIFLA* affirmed that "states may regulate professional conduct, even though that conduct incidentally involves speech." *Id*. The statute at issue in *NIFLA* required crisis pregnancy centers to notify women with posters or printed materials that the state of California provided affordable family planning services, including abortions. *Id*. The Supreme Court determined that the law regulated pure speech by compelling clinic workers to speak a particular message. *Id*. at 767.

The Supreme Court extended *NIFLA* in *Chiles v. Salazar*. *Chiles* involved a Colorado conversion therapy ban on talk therapy treatment to help minor clients change their sexual orientation or gender identity. 146 S. Ct. at 1021. But the statute permitted therapists to express acceptance and support for clients wishing to keep their gender identity and sexual orientation. *Id*. at 1018. The court concluded that the law "trains directly on the content of [the therapist's] speech and permit[s] her to express some viewpoints but not others," and so strict scrutiny was warranted. *Id*. at 1023, 1026.

*NIFLA* and *Chiles* thus established two limited types of professional regulation where strict scrutiny applies: when there is compelled professional

16

speech, and when there are prohibitions on specific messages within professional speech. *Id*. at 1026; *NIFLA*, 585 U.S. at 767.

### 3. Intermediate scrutiny applies to regulations of who can practice a profession and of conduct-based professional services.

In contrast to the compelled speech at issue in *NIFLA*, professional regulations with incidental burdens on speech are reviewed under intermediate scrutiny. This is particularly true along two lines: when the regulation determines who may practice in a profession but does not determine the speech they may engage in; and when the professional service at issue is primarily occupational conduct, even if the work involves elements of speech.

In *Capital Associated Indus., Inc. v. Stein*, 922 F.3d 198, 208, 209 (4th Cir. 2019), the court upheld a law banning corporations from practicing law because it was aimed at conduct, with an incidental burden on speech: it focused on the practice of the legal profession and who may conduct themselves as lawyers. *Id*. The court explained that when a statute does not target communicative aspects of a profession, but rather who or what entities may participate in the profession, the regulation is conduct-based with incidental effects on speech. *Id*. The court upheld the ban under intermediate scrutiny because it served to preserve professional integrity and independent judgment of attorneys, and it was appropriately tailored to protect clients. *Id*. at 209.

Similarly, in *360 Virtual Drone Servs. LLC v. Ritter*, 102 F.4th 263, 274 (4th Cir. 2024), the court upheld a law that required a license before a person could engage in the profession of land surveying. The court concluded that the statute regulated professional conduct and incidentally burdened speech. *Id.* *Ritter* reasoned that the regulation did not "control what surveyors may tell their clients, instead focusing more broadly on the question of who may conduct themselves as a surveyor." *Id.* at 267. (quotation and citation omitted). In considering whether the regulation was primarily conduct-focused, *Ritter* noted that courts are more likely to view a licensing regime as conduct-focused when it "carries legal, health, economic, or public-safety-related consequences." *Id.* at 274.

Courts have also upheld regulations of professions primarily involving conduct, even when speech is part of the job. In *Del Castillo v. Secretary, Florida Department of Health*, 26 F.4th 1214, 1226 (11th Cir. 2022), an unlicensed health coach challenged a licensing requirement to practice as a dietician. The court rejected the argument that the law violated the right to give opinions and advice on nutrition. *Id.* The court explained that the practice of nutrition, which involved assessing nutrition needs, conducting research, and developing nutrition plans, amounted primarily to non-expressive occupational conduct. *Id.* at 1225–26. Although the profession involved speech, that burden was secondary to regulating conduct. *Id.* at 1226; *see also Locke v.*

18

*Shore*, 634 F.3d 1185, 1191 (11th Cir. 2011) (upholding an interior design licensing statute where the profession involved occupational conduct but not a substantial amount of protected speech.) Regulations of professional conduct that only burden speech incidentally require intermediate scrutiny.

> **4.  The Wisconsin program is subject to intermediate scrutiny because it is a conduct-based professional regulation with incidental effects on speech.**

Wisconsin's program is subject to intermediate scrutiny because it is conduct-focused with incidental burdens on speech. Strict scrutiny does not apply because there is no compelled professional speech or prohibitions on specific messages within professional speech. Like the laws upheld in *Stein* and *Ritter*, the Wisconsin program regulates which entities can operate as private career schools. It does not limit who can teach, or what teachers can say.

To begin, strict scrutiny is not applicable here because unlike the laws at issue in *NIFLA* and *Chiles*, the Wisconsin program does not compel Masterson to communicate any particular message or prohibit him from expressing certain messages while approving others. It does not require him to alter his speech at all. He may teach the same equine care content in Wisconsin whether he covered or exempt from the Wisconsin program.

The Wisconsin program defines a school as "any private, trade, correspondence, business, or technical school." Wis. Stat. § 440.52(1)(e). The

statute exempts training that is avocational and recreational; the exemption applies to "schools primarily offering instruction avocational or recreational in nature and not leading to a vocational objective." Wis. Stat. § 440.52(1)(e)4.

The Wisconsin program therefore regulates what a private career school must do to participate in the profession of offering vocational instruction. *Stein*, 922 F.3d at 208. Phrased another way, the "conduct triggering coverage under the statute" is offering avocational or recreational instruction. *Holder*, 561 U.S. at 27–28; Wis. Stat. § 440.52(1)(e)4. That is a regulation of professional conduct, not speech.

Indeed, the Wisconsin program regulates primarily operational business conduct that is unrelated to speech. *See Del Castillo*, 26 F.4th at 1226. It is directed at business conduct like financial management practices, educational product development, grading practices, attendance, and tuition policies, facility permits, record retention, and complaint procedures. (Gage Dec. ¶¶ 6–12); Wis. Stat. § 440.52. These aspects of running a school illustrate that teaching is only part of what Masterson's (or any) school does. Masterson engages a wide variety of non-teaching conduct: designing programs and courses, setting pricing and tuition models; creating workbooks and prerequisite materials; designing and maintaining his website and marketing materials; keeping a database of certified practitioners, setting cancellation

policies, locating facilities to hold courses; hiring instructors; and more. (*See* Hipsman Dec. Exs. E–G.)

Wisconsin's program focuses on the non-communicative occupational conduct of private career schools; it does not target or limit what Masterson can say or teach to his students. And like in *Ritter*, Wisconsin's program "conduct carries legal, health, economic, or public-safety-related consequences." *Ritter* 102 F.4th at 274. Because Wisconsin's program regulates conduct that only incidentally affects speech, it is subject to intermediate scrutiny.

### 5. Wisconsin's program easily satisfies intermediate scrutiny.

A professional regulation that incidentally burdens speech survives intermediate scrutiny "if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *Richwine*, 148 F.4th at 954 (quotation and citation omitted). This means that "[t]here must be a reasonably close fit between the law's means and its ends, though perfect calibration is not required." *Id.* (citing *Nicodemus v. City of South Bend*, 137 F.4th 654, 668 (7th Cir. 2025) (quotation omitted).

Wisconsin's program easily meets the intermediate scrutiny test: it serves important government interests and is reasonably drawn to achieve them.

First, it serves multiple important government interests. Broadly speaking, the state has an important governmental interest in consumer protection. *Sorrel*, 564 U.S. at 579 (the government has a legitimate interest in protecting consumers from commercial harms). More concretely, the state has important interests to "protect students, prevent fraud and misrepresentation in the sale and advertising of courses and courses of instruction, and encourage schools to maintain courses and courses of instruction consistent in quality, content, and length with generally accepted educational standards." Wis. Stat. § 440.52(7). This includes the state's interests in financial protection, preserving and ensuring access to student records, ensuring safe and sanitary learning facilities, and protecting students from educational discrimination. Wis. Admin. Code Ch. SPS § 404. None of these interests are related to the suppression of protected speech or seek to censor the viewpoint taught by any school. *Richwine*, 148 F.4th at 954.

Second, the Wisconsin program is reasonably drawn to advance these interests. As a general matter, the need for robust consumer protections when

it comes to private trade and occupational schools is well documented.[1] An internet search reveals anecdote upon anecdote of students who have been harmed by  the practices of these institutions, including in Wisconsin.[2] Indeed, within the last year, Wisconsin lawmakers citing "a pattern of financially exploitative tactics" by private career schools advanced a package of proposed bills to strengthen oversight of private educational institutions, beyond the protections that the Wisconsin program already provides.[3] The measures permit students to sue private career schools for providing false advertising and increase fees that the state could collect for student protection in the event of a school closure.[4] 2025 Wis. S.B. 629; 2025 Wis. S.B. 630; 2025 Wis. S.B. 631.

---

[1] See, e.g. U.S. Senate Committee on Health, Education, Labor, and Pensions, For Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success, July 30, 2012, www.govinfo.gov/content/pkg/CPRT-112SPRT74931/pdf/CPRT-112SPRT74931.pdf (last visited June 18, 2026); Luis Armona, Rajashri Chakrabarti & Michael F. Lovenheim, National Bureau of Economic Research, How Does For-profit College Attendance Affect Student Loans, Defaults and Labor Market Outcomes?, September 2018, https://www.nber.org/papers/w25042 (last visited June 18, 2026); Sarah Ann Schade, Reining in the Predatory Nature of For-Profit Colleges, Arizona L. Rev., Vol. 56:3167, www.arizonalawreview.org/pdf/56-1/56arizlrev317.pdf (last visited June 18, 2026).

[2] See, e.g., Jeremy Bauer-Wolf, Students Need Protection from Predatory For=-Profit Colleges, Urban Milwaukee, November 18, 2025, https://urbanmilwaukee.com/2025/11/18/op-ed-students-need-protection-from-predatory-for-profit-colleges/ (last visited June 18, 2026).

[3] Cleo Krejci, Milwaukee-area lawmakers propose laws to crack down on for-profit colleges, Milwaukee Journal Sentinel, October 20, 2025, https://www.jsonline.com/story/news/education/2025/10/20/for-profit-colleges-at-issue-in-new-bills-from-milwaukee-area-lawmakers/86671704007/ (last visited June 18, 2026).

[4] Cleo Krejci, Milwuakee Journal Sentinel, Milwaukee-area lawmakes propose laws to crack down on for-profit colleges, October 20, 2025,

In recognition of these risks, the Wisconsin program focuses on occupational schools because students who believe that a program will help their career prospects may assume more risk and are more susceptible to predatory conduct. In addition to the states, the federal government has regulated private occupational schools to protect students since the 1960s. *See, e.g.*, 20 U.S.C. § 1002.

The harms that the Wisconsin program addresses are not speculative or abstract. The department has received complaints about all the problems the Wisconsin program is designed to protect against, including reports of deceptive advertising, discrimination and discriminatory expulsion, program quality and content, quality of instruction, access to books and labs, and more. (Gage Dec. ¶ 30.) Students have contacted the department to obtain transcripts or diplomas when a private career school they attended in the past has closed. (Gage Dec. ¶ 30.) And students have reported unsafe and sanitary learning facilities. (Gage Dec. ¶ 30.) Masterson seems to see professional horse massage training not to feature these risks, but he offers a $6,000 equine bodywork certified practitioner program that takes up to two years to complete—a significant commitment of time and money. (Hipsman Dec. Ex. E.) It is not

---

https://www.jsonline.com/story/news/education/2025/10/20/for-profit-colleges-at-issue-in-new-bills-from-milwaukee-area-lawmakers/86671704007/ (last visited June 18, 2026).

clear why this type of school poses a lower risk to consumers than other professional schools the Wisconsin program regulates.

Masterson attacks the Wisconsin program's anti-fraud components as unnecessary because Wisconsin already has general prohibitions on fraud in Wis. Stat. §§ 100.18(1) and 943.20(1)(d). These general fraud and misrepresentation statutes are not duplicative of the Wisconsin program's protections. The Wisconsin program provides additional protections of surety bond payments to fraud victims, and opportunities for settlement and department involvement in fraud complaints, that the general statutes do not have. Wis. Admin. Code SPS §§ 404.06(3) and 404.08(2)(b)3.

The Wisconsin program also does not unreasonably burden schools. Masterson points specifically to the requirement of preparing a school catalogue, and the $2,000 application fee. (Dkt. 3:20.) But the checklist fields consist primarily of information that most schools already possess. (Dkt. 1-6.) Indeed, most of the general information requested in the checklist is already on Masterson's website (school name, mission statement, owner, credit hours, course descriptions, educational objectives, and more). In fact, the department estimates that a diligent and competent school administrator could complete the school catalogue and application process in approximately 10 hours. (Gage Dec. ¶ 18.) Once a school submits application materials, the Wisconsin program typically completes review within 30 days, even though up to 70 days

25

are allowed by statute. (Gage Dec. ¶ 16.) And as to the application fee, it amounts to one third of one student's practitioner certification program.

Masterson also discusses the burdens of the bonding requirement. (Dkt. 3:8.) But the bond amount is individualized and proportional to each school's revenue: the lesser of $25,000 or 125 percent of unearned tuition determined by a Wisconsin program calculation formula. Wis. Admin. Code SPS § 404.06(1). Further, the bond amount may be reduced if it is excessive in relation to the school's economic risk based various financial stability criteria. Wis. Admin. Code SPS § 404.06(1). And generally speaking, the cost of obtaining a surety bond is a small percentage of the total bond amount. Individualized revenue-based bond requirements are valid if they are related to a legitimate state interest. *Dayton Area Visually Impaired Persons, Inc. v. Fisher*, 70 F.3d 1474, 1486 (6th Cir. 1995).

The Wisconsin program's record retention requirements provide another example of a reasonably tailored regulation. Private career schools must permanently retain transcripts. Wis. Admin. Code § 407.02. That is because students request transcripts more frequently than any other educational record; they are often needed to apply to jobs and other educational programs. (Gage Dec. ¶ 30.) All other records, however, must be kept for only six years, and the state takes over record-keeping requirements in the event of a merger, consolidation, change of ownership, or dissolution. Wis. Admin. Code § 407.02.

For all of these reasons, many schools do not view Wisconsin program approval as a burden at all—but rather as a benefit that builds consumer confidence. (Gage Dec. ¶ 25.) There are currently 149 private career schools operating with active Wisconsin program approval, including 5 new schools approved so far this year. (Gage Dec. ¶ 29.)

Finally, Masterson proposes two less burdensome alternatives to the Wisconsin program: (1) an "opt-in" educational approval program, or (2) a published list of schools that have been accredited by reputable private organizations. (Dkt. 3:22–23.) Neither option would serve Wisconsin's legitimate state interests in protecting students. Just because a private school is accredited by a reputable private organization does not provide students with any financial protection if a school closes unexpectedly, ensure safe and sanitary learning facilities, guarantee access to transcripts, or provide other general protections. Opt-in programs do not protect students from bad actors with no desire for accountability. The Wisconsin program is appropriately tailored to protect students and achieve the government's consumer-protection interests.

### 6. Masterson's strict scrutiny arguments fail.

Masterson makes two main arguments why strict scrutiny should apply to the Wisconsin program, but neither succeeds. Relying on a Ninth Circuit case, *Kirchmeyer*, and a district court case from Minnesota, *Mox*, he contends

that the Wisconsin's avocational exemption is content based. (Dkt. 3:15–17.) But the Wisconsin exemption is not like the statutes in *Kirchmeyer* and *Mox*. He also asserts that the department is reviewing schools' curriculum for content, but he offers no facts in support of that claim.

### a. Wisconsin's program is not like the content-based laws in *Kirchmeyer* and *Mox*.

A regulation of speech is content based if it applies because of the topic discussed or the message conveyed. *City of Austin, Texas v. Reagan Nat'l Advert. Of Austin, LLC*, 596 U.S. 61, 69 (2022). Content-based laws are subject to strict scrutiny and presumed unconstitutional. *Reed v. Town of Gilbert, Ariz.,* 576 U.S. 155, 163 (2015). The rationale for these limits is to prevent the government from silencing certain ideas or viewpoints. *Brown v. Kemp*, 86 F.4th 745, 778 (7th Cir. 2023). The principal inquiry in determining content neutrality is whether the government has adopted a regulation of speech because it disagrees with the message conveyed. *Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989). A regulation is content neutral "so long as it is "justified without reference to the content of the regulated speech." *Brown*, 86 F.4th at 780.

In *Kirchmeyer* and *Mox* (both cases brought by Masterson's counsel), the courts invalidated regulations of private career schools based on the exemptions in the laws at issue. (Dkt. 3:19–20.) But unlike the Wisconsin

28

program, those exemptions turned on the subject taught. They were content based and as a result, subject to strict scrutiny.

*Kirchmeyer* involved a challenge to California's private career school "ability to benefit" statute, which required students without a high school diploma or equivalent to pass a prescribed examination before enrolling in a private postsecondary school. *Pacific Coast Horeshoeing School, Inc. v. Kirchmeyer*, 961 F.3d 1062 (9th Cir. 2020). The statute exempted numerous professions and types of schools from the requirement, including flight instruction, test preparers, classes sponsored by trade organizations, apprenticeship entities, nonprofit religious organizations, nonprofit public benefit corporations, and community-based organizations. *Id.* at 1071–72. The court concluded that the program was content based because it contained numerous exemptions that turned on "(1) the content of what is being taught, or (2) the identity of the speaker." *Id.* at 1070. The exemptions "picked winners and losers" based on the profession and the operators of the school. *Id.* The statute also contained an avocational exemption. The court determined that whether a course was avocational "turned on the nature of what is being taught." *Id.* So some subjects (like horseshoeing) were per se vocational, but others (like golf) were per se avocational. *Id.* at 1070–71. The distinction was entirely content based and could not survive strict scrutiny. *Id.*

In *Mox*, plaintiffs challenged Minnesota's avocational exemption to its private career school program. *Mox v. Olson*, 807 F.Supp.3d 926, 931–32 (MN Dist. 2025). The court determined that the exemption contained two problematic aspects. First, the exemption treated four subjects as avocational based on the topic alone: adult basic education, exercise and fitness teacher programs, modeling, and acting. *Id.* at 931–32 (statutory definition). Relying on *Kirchmeyer*, the court determined that those subject-specific exemptions were content based because they "appl[y] to particular speech because of the topic discussed." *Id.* at 948–49. Second, the exemption covered classes based on the course's vocational or avocational "intent" or "purpose." *Id.* at 932. The court was concerned that the state decided the purpose of the instruction by looking at the course's subject area: treating bicycle repair, for example, as inherently recreational. *Id.* at 949.

As an initial matter, Masterson overreads *Mox*. He contends that *Mox* stands for the idea that a state regulation cannot consider the purpose of speech. (Dkt. 3:15.) But that is not what *Mox* held. Instead, *Mox* says that the Minnesota statute was content based because it inferred purpose based on the topic taught. *Mox*, 807 F. Supp.3d at 949 (if a course's content is relevant to a vocational-avocational determination, "that would transform a purpose-directed inquiry into one that is content-based.") Neither *Mox* nor *Reed,* the case cited in *Mox*, mean that states cannot consider the purpose of speech as a

30

general principle under the First Amendment. Otherwise, it is difficult to see how the government could regulate any specific or specialty school, like medical, nursing, or veterinary programs.

Beyond Masterson's misreading of *Mox*, Wisconsin's program exceptions are not like the laws struck down in *Kirchmeyer* and *Mox*. As to the statute's general list of exemptions, Wisconsin's are not based on the subject taught. They are based on whether the education is regulated by other means: long-established in-state schools; schools regulated by different state agencies, departments, boards, and accrediting bodies; schools supported by taxes; certain parochial schools; and courses by employers for their employees (offered internally, not to the public). Wis. Stat. §§ 440.52(1)(e)2.–4. and 5, 440.52(1)(e)6.–10. These exemptions do not single out subject areas or favor particular speakers: they are not content based.

And Wisconsin's avocational exemption, unlike those in *Kirchmeyer* and *Mox*, does not define "avocational" based on the topic taught, or examine a course's topic when determining whether it is vocational. Instead, Wisconsin looks at whether the school is marketing a course of instruction to the public that will lead to a professional or occupational benefit. (Gage Dec. ¶¶ 21–23.) So, if a school taught horseback riding for personal enjoyment, it would be exempt. (*See* Dkt. 3:8.) If it offered a practitioner certification to horseback ride professionally, it would need program approval. If it offered plumbing and

electrical classes, but only to help homeowners become handier, it would be exempt. If it offered plumbing and electrical classes with a professional credential, it would be covered. The list of approved schools illustrates the point: it includes schools for traditional vocational subjects like welding, dental assistance, and phlebotomy, but also schools for what might be considered hobby subjects like art, yoga, and spirituality, and everything in between (chainsaw carving, coding, and taxidermy).[5] None of this is content based.

### b. Masterson offers no facts in support of his curriculum review assertion.

Masterson briefly offers a final theory: that Wisconsin is engaging in content based review of schools' curriculum. (Dkt. 3:16–17.) He suggests that because the Wisconsin reviews the curricula and materials taught in professional schools for quality purposes, it means that the department regulates on the basis of what is taught. (Dkt. 3:16–17.)

But Masterson offers no factual support for the proposition that the Wisconsin program reviews the messages that private career schools teach. And he offers no evidence that this happened to him. The purpose of the Wisconsin program is to ensure quality education, but it does not dictate the communicative content or expressive aspects of instruction.

---

[5] State of Wisconsin Educational Approval Program, Results for All Schools https://dspseap.wi.gov/search/searchbycategory.asp (last visited June 18, 2026).

In conclusion, Masterson has not made a strong showing that his First Amendment claim will succeed on the merits. Not only is his claim unripe, but the Wisconsin program is a garden variety, content-neutral regulation of professional conduct for private career schools. The Wisconsin program survives intermediate scrutiny because it provides critical protections to Wisconsin students and is appropriately calculated to do so. The Wisconsin program is simply not the speech-burdening, overreaching regulation that Masterson portrays.

**II.      Because Masterson has not shown a strong likelihood of success on the merits, this Court need not proceed to the other factors; but he fails to show irreparable harm.**

Masterson has not demonstrated that he is likely to succeed on the merits of his First Amendment claim, so the court should not proceed to the remaining factors. In any event, Masterson cannot show that he will be irreparably harmed without an injunction.

To support a preliminary injunction, the asserted irreparable harm must be near-term and imminent, not remote. *Bedrossian v. Northwestern Memorial Hospital*, 409 F.3d 840, 846 n. 3 (7th Cir. 2005); *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 19 n. 6 (7th Cir. 1992). Here, even if court had constitutional concerns with the Wisconsin program, Masterson's website indicates that he no longer offers a practitioner certification program marketed to have occupational objectives. (Hipsman Dec. Exs. E–G.) Masterson is free to teach

his equine method in Wisconsin without program approval so long as he does not hold himself out as offering a professional program. Masterson does not demonstrate that he needs an injunction to teach his classes in Wisconsin. He has not established irreparable harm.

## III. The balance of the harms and equities weighs against granting an injunction.

Masterson's failure to establish either of the two threshold requirements for a preliminary injunction means that this court need not consider the balance of equities, the public interest, or weigh the harm of denying the injunction against the harm of granting the injunction. *See Life Spine, Inc.*, 8 F.4th at 539. Even so, these considerations weigh heavily against granting the preliminary injunction.

First, an injunction that allowed Masterson to teach recreational and avocational classes in Wisconsin is no different than the current law. Wis. Stat. § 440.52. Alternatively, an injunction that permitted Masterson to hold classes in Wisconsin that are intended to confer professional and vocational benefits would leave his students without critical protections. Masterson's classes and certification program are expensive and time consuming. (*See* Hipsman Dec. Exs. E–G.) It would not be in the public interest to deny Masterson students the same important protections—fair tuition reimbursement policies, safe and sanitary facilities, quality instruction, record retention, and protection from

discrimination—that other Wisconsin career school students are entitled to. And a consequence of such a preliminary injunction, broader facial relief, would deny Wisconsin the ability to regulate many private career schools all together.

Second, when balancing the equities, a court should consider the moving party's unnecessary delay in requesting a preliminary injunction. *Benisek*, 585 U.S. at 160. Here, Masterson received the department's determination that it was not exempt from the program over three years ago, in 2023. (Uhlenkamp Dec. ¶ 21). He has been silent since that time. And he took no steps to pursue the state remedies available to him in 2023, either: he could have sought review of the decision under Wisconsin's Administrative Procedure Act, Wis. Stat. § 227.52. *Friends of the Black River Forest v. Wisconsin DNR*, 2021 WI App 54, ¶ 10, 404 Wis. 2d 590, 964 N.W.2d 342. But Masterson did not appeal the decision, instead waiting three years to bring his federal case. (Uhlenkamp Dec. ¶ 24.)

## CONCLUSION

For the reasons explained above, Masterson's motion for a preliminary injunction should be denied.

Dated this 19th day of June 2026.

Respectfully submitted,

JOSHUA L. KAUL
Attorney General of Wisconsin

Electronically signed by:

s/Faye B. Hipsman
FAYE B. HIPSMAN
Assistant Attorney General
State Bar #1123933

CHARLOTTE GIBSON
Assistant Attorney General
State Bar #1038845

FRANCES REYNOLDS COLBERT
Assistant Attorney General
State Bar #1050435

Attorneys for Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 264-9487 (FBH)
(608) 957-5218 (CG)
(608) 266-9226 (FRC)
(608) 294-2907 (Fax)
hipsmanfb@doj.state.wi.us
charlie.gibson@wisdoj.gov
frances.colbert@wisdoj.gov