IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JAMES MASTERSON, REBECCA TENGES and THE MASTERSON METHOD, INC.,

Plaintiffs,

v.

OPINION and ORDER

DAN HERETH, in his official capacity as Secretary of Wisconsin's Department of Safety and Professional Services, and JOSH KAUL,

26-cv-365-wmc

Defendants.

---

Before operating, advertising or enrolling students, private trade schools in Wisconsin must apply to and be approved by the state's Department of Safety and Professional Services under Wisconsin's Educational Approval Program ("EAP"). Schools that fail to obtain pre-approval may be subject to fines unless falling under at least one of ten exceptions enumerated in the EAP, one of which is "avocational" or "recreational" schools.

Plaintiffs in tthis case are "The Masterson Method, Inc.," an "equine bodywork" school, its owner, Jim Masterson, and a teacher at the school, Rebecca Tenges. In 2023, Wisconsin regulators told plaintiffs that this so-called "Masterson Method" both required approval under the EAP and did not qualify for an exemption as an avocational and recreational school. Finding this interpretation of the EAP approval requirements too onerous at that time, plaintiffs scaled back their operations in Wisconsin rather than seek formal approval. Approximately three years later, however, plaintiffs filed this lawsuit, contending that the EAP burdens their ability to teach Masterson's signature method of

equine care in violation of their free-speech rights under the First Amendment both facially and as-applied. Accordingly, plaintiffs seek declaratory and injunctive relief prohibiting the Department from enforcing the EAP against them.

Plaintiffs also filed a motion for preliminary injunctive relief (dkt. #2), which the state opposes on the grounds of mootness, having apparently now determined that the EAP *might* not apply to plaintiffs' school. Regardless, the state argues that plaintiffs cannot succeed on their First Amendment claim. For the reasons explained in more detail below, this court concludes that plaintiffs' claims are not moot despite the state's post-filing change in position. However, the court agrees that plaintiffs have failed to make a sufficient showing of (1) a likelihood of success on their First Amendment claim *or* (2) that the balance of hardships weigh in favor of issuing a preliminary injunction. Accordingly, their motion for a preliminary injunction must be denied.

## BACKGROUND[1]

### A. The Masterson Method

Plaintiff James Masterson is an expert on specialized equine care and has developed a specific method of equine bodywork intended to relieve tension in horses. Masterson named this method after himself, the "Masterson Method," and purportedly teaches it

[1] These background facts are based on plaintiffs' proposed findings of fact in support of their motion for preliminary injunction (dkt. #4), defendants' responses to those findings (dkt. #25), and the evidence of record to date. The court further notes that plaintiffs filed a motion for leave to file a reply brief in support of their motion for preliminary injunction (dkt. #31), which will be granted and has been considered.

"around the world" through his school, "The Masterson Method, Inc." More specifically, the school offers multiple courses on the Masterson Method, including a weekend seminar where students practice basic techniques on horses offered in dozens of locations around the world each year. Since the Masterson School was established, thousands of people -- owners, therapists, trainers and horse enthusiasts -- have attended this weekend seminar, and several professional organizations have endorsed the weekend seminar and other courses to satisfy continuing education requirements, including the National Certification Board for Therapeutic Massage and Bodywork.

The school also offers more advanced courses and intensive certification programs for people who want to become proficient in the Masterson Method, including: (1) the "Masterson Method Certified Practitioner Program"; and (2) the "Masterson Method Equine Specialist." These advanced programs require completion of the beginning weekend seminar, then multiple, additional courses, including an advanced, five-day course. Certification also requires 30 fieldwork sessions, where trainees apply the Masterson Method to local horses. Accordingly, prospective students are told to expect it to take between nine months and two years to complete the Certified Practitioner program in its entirety.

People become Certified Practitioners for a variety of reasons. Some are equine professionals (e.g., trainers, practitioners of traditional horse massage, or veterinarians), while others are looking only to care for their own horses. Although many of the students in the Certified Practitioner program plan to use the methods professionally, the Masterson School's marketing focuses on the effectiveness of the method, not on career opportunities

that studying the method might provide. Even so, the Masterson School's website has, at various times, included statements suggesting that certification can open vocational opportunities for those looking to launch or diversify their equine bodywork businesses. Further, Certified Practitioners may also become instructors in the Masterson Method itself, including plaintiff Rebecca Tenges, who teaches the Masterson Method to individuals at the weekend and advanced courses at various locations throughout the country.

In March 2023, Tenges was preparing to teach The Masterson School's advanced, five-day course in Wisconsin, having previously taught courses in Wisconsin without issue. However, on March 20, 2023, a Minnesota-based, equine bodywork business contacted Wisconsin's Department of Safety and Professional Services ("the Department"), which is tasked with regulating state businesses, professions and industries under Wis. Stat. § 15.40, and reported that The Masterson School was offering classes in Wisconsin without authorization by the Department, and more specifically, in violation of Wisconsin's EAP.

**B. Wisconsin's Educational Approval Program**

Wisconsin's EAP regulates private, trade, and technical schools and requires the Department to "protect the general public" by: inspecting and approving private trade, correspondence, business and technical schools; approving changes in ownership and control over schools; approving teaching locations and courses of instruction; and regulating how schools solicit students. Wis. Stat. § 440.52(2). Similarly, the EAP's mandate is to: protect students from fraud and misrepresentation in educational

advertising; safeguard students financially; and encourage schools to maintain quality programming that is consistent with educational standards. Wis. Stat. § 440.52(7). To that end, the Department adopted and issued administrative rules establishing an approval process and standards for private career school operations, including sales and advertising, fraud prevention, educational facilities and classrooms, curricula, instructors, enrollment policies, tuition, refunds and other payment policies. Wis. Admin. Code SPS ch. 400, *et seq*.

The approval process requires schools to submit an application and fee, along with: ownership, governances and administrative leadership details; program and curriculum materials; a school catalog that includes admission criteria, tuition details, refund policies and graduation requirements; a copy of the student enrollment agreement containing all mandatory state disclosures and cancellation/refund terms; financial documentation; current safety and fire inspection reports for instructional sites; faculty and representative records; advertising and promotional samples; and a proof of a surety bond, usually in the amount of $25,000. Further, Wisconsin law defines "school" as "any private trade, correspondence, business, or technical school" except for schools that qualify under certain enumerated exceptions. Wis. Stat. § 440.52. Aside from an exemption for schools offering primarily recreational and avocational instruction, these exemptions are based on whether the education is regulated by other means. For example, exemptions are recognized for: long-established in-state schools; schools regulated by different state agencies, departments, boards, and accrediting bodies; schools supported by taxes; certain parochial

schools; and courses by employers for their employees (offered internally, not to the public). Wis. Stat. §§ 440.52(1)(e)1.– 10.

In determining whether a school qualifies for the avocational or recreational exemption, the Department considers whether the school is marketing a course of instruction to the public leading to a professional or occupational benefit. (Gage Dec. (dkt. #29) ¶¶ 21–23.) Thus, a school teaching horseback riding for personal enjoyment would be exempt, while a school offering "practitioner certification to horseback ride professionally" would need program approval. (Dkt. #26, at 31.) Likewise, according to the Department, if a school "offered plumbing and electrical classes, but only … help homeowners become handier, it would be exempt"; in contrast, if a school offered similar instruction, but with a "professional credential," it would be covered. (*Id.*, at 32.) As a result, the list of schools approved by the EAP includes traditional vocational subjects like welding, dental assistance, and phlebotomy, but also schools for what might be considered "hobby subjects," like art, yoga, and spirituality, as well as everything in between (e.g., chainsaw carving, coding, and taxidermy). *See* State of Wisconsin Educational Approval Program, Results for All Schools, https://dspseap.wi.gov/search/searchbycategory.asp (last visited November 8, 2026).

Finally, the Department is authorized by regulation to "investigate any school and its programs upon receipt of a complaint from an interested person." Wis. Admin. Code SPS § 404.08(2). In this case in particular, after receiving a complaint from a Minnesota business in March 2023, the Department reviewed Masterson School's website and determined additional information was needed from Masterson to determine whether the

EAP would apply to his school. At that time, Masterson advertised a four-step, practitioner certification program, whose described purpose was to prepare students for "professional equine bodywork" and a horse-related "vocation." (March 2023 website (dkt. #27-2.)) The website also listed all certified practitioners worldwide and provided their business contact information. (Dkt. #27-4.)

### C. Wisconsin's EAP Contacts Masterson

On March 22, 2023, the Department's EAP staff emailed James Masterson, asking that he explain the program and its requirements. Over the next two weeks, Masterson exchanged emails and information with the EAP regarding his school, method and courses. On April 7, 2023, the Department also received a second report that Masterson was offering equine bodywork classes without program approval. EAP staff then contacted Masterson, directing him to discontinue advertising for, recruiting, enrolling, or attempting to offer training to Wisconsin residents until the school's status was resolved by the EAP. EAP staff also stated that if the class continued, the Department would be required by law to report Masterson's school to state legal counsel and he could be fined $550 per day for every day the Masterson School operated out of compliance.

In response, Masterson removed all Wisconsin courses from the school's website, while still asserting that Masterson Method courses should be exempt from regulation under the EAP as "avocational or recreational in nature" and *not* leading "to a vocational objective" under Wis. Stat. § 440.52(1)(e)(4). (Dkt. #1-4, at 4.) Masterson also explained that: (1) his courses primarily enhance horse-owners' or equine professionals' relationships

with their horses; and (2) the certification process serves only as an acknowledgement that the participants have demonstrated proficiency in Masterson Method techniques. (*Id.*, at 5.) He then concluded by inviting EAP staff to an upcoming demonstration at the Midwest Horse Fair in Madison, Wisconsin. (*Id.*, at 4) However, the EAP staff responded that the advanced, five-day course did not meet this "avocational exemption," because the school's website stated that it was required for those interested in becoming a "Masterson Method Certified Practitioner." (*Id.*) Staff further invited Masterson to send all his documentation regarding program curriculum, student handbook and training materials for review, reminding Masterson that he could be fined if again found to be operating his school out of compliance.

On April 12, 2023, Masterson responded once more, reiterating that he had removed all advertising for Wisconsin courses from the school's website, but questioning whether he could still offer his weekend seminar in Wisconsin, as opposed to the advanced five-day course. EAP staff next responded that Masterson was still required to send for a compliance review: all the documentation he had regarding his program curriculum, student handbook and training materials. Two days later, Masterson sent the instructor outline and student workbook for his cornerstone weekend seminar. On April 21, EAP staff notified Masterson that it had reviewed his submitted materials, public website and social media materials, but again determined that its programs were not avocational or recreational. Instead, EAP staff explained that Masterson's programs were "being offered and marketed to therapists and trainers who would utilize the materials learned from the program for occupational purposes." (Dkt. #27-10.) Thus, he was advised, The Masterson

School would have to undergo EAP approval if its courses were to be taught in Wisconsin. The next day, April 22, 2023, Masterson informed the Department that he would "work to comply" with Wisconsin law. However, the Department received no further communication from Masterson for more than three years before being served with the summons and complaint in this lawsuit.

## OPINION

Plaintiffs request that the court enter a preliminary injunction enjoining defendants from enforcing Wisconsin's EAP against them for the pendency of this case. Preliminary injunctive relief is an "extraordinary equitable remedy that is available only when the movant shows clear need." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 661 (7th Cir. 2015); *see also Doe v. Univ. of S. Indiana*, 43 F.4th 784, 791 (7th Cir. 2022) ("A preliminary injunction is an extraordinary remedy never awarded as of right.") (quoting *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008)). To obtain a preliminary injunction, plaintiffs must show that: (1) they have "some likelihood of prevailing on the merits"; (2) traditional legal remedies would be inadequate; and (3) they will suffer irreparable harm without the relief. *Finch v. Treto*, 82 F.4th 572, 578 (7th Cir. 2023); *Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020). If plaintiffs meet each of these threshold requirements, the court proceeds to a balancing analysis, weighing the harm that plaintiffs would suffer absent a preliminary injunction against the harm the state would suffer were a preliminary injunction issued, as well as considering whether an injunction is in the public interest overall. *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r*

*of Ind. State Dep't of Health*, 896 F.3d 809, 816 (7th Cir. 2018); *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018).

## I. Ripe Case or Controversy

Before turning to the preliminary injunction factors, there is a threshold, jurisdictional question as to whether this is a ripe case or controversy. *See Amling v. Harrow Indus. LLC*, 943 F.3d 373, 377 (7th Cir. 2019) (ripeness is a component of the case-or-controversy requirement for Article III justiciability). Defendants contend that plaintiffs' claim is "unripe" because it is "premised on an outdated determination by the department." (Dfts.' Br. (dkt. #26) 2.) Specifically, defendants point out that their previous determination was "based on Masterson's materials at the time," which included Masterson's website and social media from 2023 emphasizing the vocational objectives of its Certified Practitioner Program. (*Id.*, at 11) (citing Uhlenkamp Dec. ¶ 19; Hipsman Dec. Exs. A–D (stating the certification program is a "high quality training program that will prepare you to become a professional equine bodyworker," is "[f]or those who want to start their own Masterson Method equine bodywork business," and listing several reasons for obtaining a certification, including "to have a vocation where you're giving back to the horse," and "to develop skills as a professional equine bodyworker").) However, Masterson's website no longer promotes vocational and professional benefits; instead, its focus is on personal fulfillment and horse performance. Accordingly, defendants argue that plaintiffs' claim is unripe, having failed to contact the Department recently to see if the school is now exempt as primarily avocational given its updated focus.

Defendants' argument may be more properly described as one of mootness, since an "actual [case or] controversy must exist not only at the time the complaint is filed, but through all stages of the litigation." *Already, LLC v. Nike, Inc.,* 568 U.S. 85, 90–91 (2013) (citation modified). "When, during the course of litigation, the issues presented in a case 'lose their life because of the passage of time or a change in circumstances ... and a federal court can no longer grant effective relief,' the case is considered moot." *Haden v. Pelofsky*, 212 F.3d 466, 469 (8th Cir. 2000) (quoting *Beck ex rel. Beck v. Mo. State High Sch. Activities Ass'n*, 18 F.3d 604, 605 (8th Cir. 1994)). If an action is moot because it no longer satisfies the case-or-controversy requirement, a federal court has "no discretion and must dismiss the action for lack of jurisdiction." *Ali v. Cangemi*, 419 F.3d 722, 724 (8th Cir. 2005) (citing *Powell v. McCormack*, 395 U.S. 486, 496 n.7 (1969)).

Specifically, defendants purport to have changed their assessment of the EAP's application to The Masterson School *after* plaintiffs filed this lawsuit. As a general rule, however, a litigant's "voluntary cessation of allegedly illegal conduct does not ... make the case moot." *Equal Emp. Opportunity Comm'n v. Flambeau, Inc.*, 846 F.3d 941, 949 (7th Cir. 2017) (citation omitted). If it did, "a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends." *Already, LLC*, 568 U.S. at 91. "A case might become moot if subsequent events ma[k]e it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). Defendants have the "burden to show that it could not reasonably be expected to resume its enforcement efforts against"

plaintiffs, *Already, LLC*, 568 U.S. at 92, a burden sometimes referred to as "formidable." *FBI v. Fikre*, 601 U.S. 234, 241 (2024).

On this record at least, defendants have not carried that burden. At most, the Department's recent assessment of The Masterson School is equivocal and inconclusive, stating only that "it appears" the school is exempt "[b]ased on Masterson Method's current website alone." (Gage Decl. (dkt. #29) ¶ 34.) The Department concedes it has not reviewed any internal course-related documents or promotional materials or advertising not on the website and has made no final determination regarding the EAP's application to The Masterson School. Such tentative statements do not make it "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth*, 528 U.S. at 189. To the contrary, the Department acknowledges that "Masterson may teach his equine method in Wisconsin without EAP approval so long as he offers recreational and avocational instruction not leading to a vocational objective." (*Id.*, at ¶ 35.) In contrast, despite their website updates, plaintiffs represent that The Masterson School offers some courses that simultaneously prepare some students for occupational, professional, or career purposes, and which some students take for personal enjoyment, recreation or as a hobby. (Dkt. #31-2, ¶¶ 9, 11–12.) Because defendants represent that vocational instruction is subject to the EAP, plaintiffs' claim is not moot.

## II. Likelihood of Success on the Merits

Turning to whether plaintiffs have shown "some likelihood of success" on the merits of their as-applied First Amendment challenge, they must show more than "a mere possibility of success" but "need not show that it definitely will win the case." *Grubhub Inc.*

*v. Relish Labs LLC*, 80 F.4th 835, 844 (7th Cir. 2023). Generally speaking, the First and Fourteenth Amendments prohibit state laws that abridge the freedom of speech or the press. U.S. Const. amend. I. This means that the government is prohibited from restricting or burdening "expression *because* of its message, its ideas, its subject matter, or its content." *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 573 (2002) (internal quotation marks omitted) (emphasis added). Such restrictions are "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). In deciding whether a speech-restricting law triggers this exacting standard of review, the court proceeds in three steps: (A) whether the law regulates speech; (B) what standard of scrutiny applies; and (C) whether the law survives. *Am. Soc'y of Journalists & Authors, Inc. v. Bonta*, 15 F.4th 954, 960 (9th Cir. 2021); *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984). The court addresses these three steps below.

**A. Whether the EAP Regulates Speech**

Plaintiffs contend that the EAP regulates speech by prohibiting them from providing instruction in the Masterson Method unless they comply with the law's burdensome approval requirements. In response, defendants contend that the EAP actually regulates professional *conduct*, while only incidentally burdening speech. While sometimes a fine one, this distinction matters because states are permitted to "regulate professional conduct, even though that conduct incidentally involves speech." *NIFLA*, 585 U.S. at 768; *see also Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011) (First Amendment "does not prevent

restrictions directed at commerce or conduct from imposing incidental burdens on speech."); *360 Virtual Drone Servs. LLC v. Ritter*, 102 F.4th 263, 274 (4th Cir. 2024) (upholding law that required a license before a person could engage in the profession of land surveying as regulating professional conduct and only incidentally burdening speech); *Del Castillo v. Sec'y, Fla. Dep't of Health*, 26 F.4th 1214, 1225–26 (11th Cir. 2022) (upholding license requirement for nutritionists as regulation of "occupational conduct"); *Capital Associated Indus., Inc. v. Stein*, 922 F.3d 198, 207–08 (4th Cir. 2019) (upholding ban on corporate practice of law because the relevant "statutes [did not] target the communicative aspects of practicing law").

The challenge is to decide whether a regulation primarily regulates professional conduct while only incidentally burdening speech. *See Richwine v. Matuszak*, 148 F.4th 942, 953 (7th Cir. 2025) ("The division between speech and conduct has not been evenly applied throughout the country, particularly when it comes to licensing schemes that determine which individuals can speak about certain topics."); *Shamrock Hills, LLC v. Iowa*, 186 F.4th 1028, 1036 (8th Cir. 2026) ("[W]hen it comes to deciding whether professional licensing regimes like the one at issue here regulate conduct or speech, few questions have given the courts of appeals more trouble."); *Hines v. Pardue*, 117 F.4th 769, 775 (5th Cir. 2024) (2026) ("As it stands today, the relevant First Amendment doctrine is a mind-numbing morass of tangled precedents developed in contexts very different from professional licensing.").

Here, the statute and regulations at issue restrict private schools offering vocational instruction from operating in the state unless approved by the Wisconsin Department of

Safety and Professional Services. As applied to plaintiffs, the statute and regulations burden speech-based activities, including teaching, which is protected by the First Amendment. *See Chiles v. Salazar*, 607 U.S. 627, 644 (2026) ("While the First Amendment protects many and varied forms of expression, the spoken word is perhaps the quintessential form of protected speech."); *McDonald*, *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 802 (1988) ("Generally, speakers need not obtain a license to speak."); *Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*, 961 F.3d 1062, 1069 (9th Cir. 2020) ("There can be little question that vocational training is speech protected by the First Amendment.") Thus, the court will assume for purposes of addressing plaintiffs' preliminary injunction motion that Wisconsin's EAP burdens protected speech.

**B. Content Neutrality**

This leads the court to step two of the First Amendment analysis: determining what level of heightened scrutiny applies. The parties dispute whether the EAP regulations are subject to strict scrutiny as a content-based regulation of speech or intermediate scrutiny as a content-neutral one. *See National Institute of Family and Life Advocates v. Becerra*, 585 U.S. 755, 766 (2018) (*"NIFLA")* ("[O]ur precedents distinguish between content-based and content-neutral regulations of speech.") A content-based regulation "target[s] speech based on its communicative content," restricting discussion of a subject matter or topic. *City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022) (citing *Reed*, 576 U.S. at 163). "As a general matter," a content-based regulation is

"'presumptively unconstitutional and may be justified only if the government proves that [it is] narrowly tailored to serve compelling state interests.'" *NIFLA*, 585 U.S. at 766.

"The rationale of the general prohibition [on content-based restrictions] ... is that content discrimination 'raises the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace.'" *Davenport v. Washington Educ. Ass'n*, 551 U.S. 177, 188 (2007) (citations omitted). The Supreme Court has further distinguished a particularly "egregious form of content discrimination": viewpoint discrimination. *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). A viewpoint-based regulation targets not merely a subject matter "but particular views taken by speakers on a subject." *Id*. Viewpoint discrimination's "violation of the First Amendment is ... more blatant." *Vidal v. Elster*, 602 U.S. 286, 292–93 (2024); *see also Chiles*, 607 U.S. at 641 ("When the government seeks not just to restrict speech based on its subject matter, but also seeks to dictate what particular opinion or perspective individuals may express on that subject, the violation of the First Amendment is all the more blatant.") (internal quotation and citation omitted)).

Plaintiffs contend that Wisconsin's EAP is necessarily content-based, viewpoint discrimination law that penalizes vocational schools in favor of avocational schools, subject to strict scrutiny under the First Amendment. In response, defendants argue that the law is a content-neutral and nondiscriminatory statute that need only satisfy the "less stringent test" of intermediate scrutiny, which requires a showing that the challenged approval requirements: (1) advance important governmental interests unrelated to the suppression of free speech; and (2) do not burden substantially more speech than necessary to further

those interests. *Richwine*, 148 F.4th at 954 (citing *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 471 (2025)).

Again, "[d]eciding whether a particular regulation is content based or content neutral is not always a simple task." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994). The Supreme Court has explained that the "principal inquiry in determining content neutrality ... is whether the government has adopted a regulation of speech because of [agreement or] disagreement with the message it conveys." *Id.* (citation omitted). "As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based." *Id.* "By contrast, laws that confer benefits or impose burdens on speech without reference to the ideas or views expressed are in most instances content neutral." *Id.* (law requiring cable systems to carry local broadcast stations was content-neutral because application depended on capacity, not content of programming)*; see also Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 804, 814 (1984) (ordinance prohibiting the posting of signs on public property found to be content-neutral because it "is neutral—indeed it is silent—concerning any speaker's point of view").

Based on the record before the court at the preliminary injunction stage at least, the court finds that the EAP is likely to be found a content-neutral regulation. First, unlike many cases in which the Supreme Court has held a law to be content-based, the law here does not amount to government censorship of controversial, unpopular or disfavored viewpoints. For example, in *Police Dep't of Chi. v. Mosley*, 408 U.S. 92 (1972), the Court invalidated a city ordinance prohibiting picketing within 150 feet of a school unless

involving a labor dispute, ruling that "government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views." *Id.* at 96. As the Court explained, such content discrimination was unconstitutional because, "above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Id.* Similarly, in *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786 (2011), the Supreme Court held that a California law banning vendors from selling "violent video games" to minors was an impermissible content-based speech restriction. Id. at 789. "Violent" speech, the Court reasoned, is a particular kind of speech -- and thus, a particular kind of content -- making California's singling it out for unfavorable treatment content based. *Id.*, at 799. Even as to minors, who enjoy more limited First Amendment protections, the government does not possess "a free-floating power to restrict the *ideas* to which children may be exposed." *Id.* at 794 (emphasis added). Accordingly, the Court held speech that is protected for minors -- including violent speech -- "cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Id.*, at 795 (citation omitted).

More recently, in *Chiles*, the Supreme Court found an ordinance prohibiting mental health professionals from engaging in conversion therapy with clients to be a content-based restriction. Specifically, the Court held that the statute prohibited "*any* practice or treatment" attempting "to change an individual's sexual orientation or gender identity," including "any effort to change behaviors or gender expressions or to eliminate or reduce sexual or romantic attraction or feelings toward individuals of the same sex." 607 U.S. at

635. "At the same time," the statute expressly allowed mental health professionals to provide "acceptance, support, and understanding for the facilitation of an individual's identity exploration and development," as well as "assistance to a person undergoing gender transition." *Id.* (citation modified). The only question before the Court in *Chiles* was whether this statute was subject to strict scrutiny, which the Court concluded that it was, having discriminated based on content and, even "a step further," based on viewpoint. *Id.* at 645. In particular, as applied to Chiles, Colorado's conversion therapy ban was found to have "prescrib[ed] what views she may and may not express" in her speech to her clients. *Id.*

Wisconsin's EAP is unlike the content-based restrictions just discussed above. Although the law regulates -- and to that extent limits -- who can engage in vocational instruction, the EAP does not turn on the content of what a teacher says, nor does it approve private schools whose "views it finds acceptable," while refusing to approve "less favored or more controversial views." *Mosley*, 408 U.S. at 96. Neither does it restrict a specific category of ideas, like the law in *Brown*, or "prescribe what views [a teacher] may and may not express." *See Chiles*, 607 U.S. at 645. Rather, the Wisconsin EAP applies -- regardless of what is said -- only to speech made in a particular context. For example, the law itself places no limits on *what* an instructor may say in providing vocational instruction. Rather, unlike the laws that are based on the content of the speech, Wisconsin's EAP applies if the speech is made within a private school advertising or purporting to deliver vocational results. Most fundamentally, there is no possibility or "specter that the

Government may effectively drive certain ideas or viewpoints from the marketplace." *Davenport*, 551 U.S. at 188.

This conclusion finds support from several other Supreme Court and circuit court decisions. For example, in *Heffron v. International Soc. for Krishna Consciousness, Inc.*, 425 U.S. 640 (1981), the Court upheld as content neutral a regulation restricting all solicitation at the Minnesota State Fair, as well as all sale or distribution of merchandise, to a specific location. *Id*. at 643–44. The state had applied the restriction against a religious practice that included "solicit[ing] donations for the support of the Krishna religion." *Id.,* at 645. As a result, members of the religion were free to roam the fairgrounds and discuss their beliefs, but prohibited from asking for donations for their cause outside of a designated location. *Id.,* at 646. The Court upheld the state's application of this restriction as content neutral, emphasizing that it "applie[d] evenhandedly to all who wish[ed] ... to solicit funds," whether for "commercial or charitable" reasons. *Id.* at 649; *see also Austin v. Reagan National Advertising of Austin*, 596 U.S. 61, 65–66, 71 (2022) (city prohibition on off-premise signs was content-neutral because it made no distinctions based on topic, message, idea or subject matter); *Computer & Commc'ns Indus. Ass'n v. Uthmeier*, No. 25-11881, 2026 WL 3071065, at *10 (11th Cir. Oct. 14, 2026) (law is content neutral where it "regulates social-media platforms based on their functional capabilities and features, not the content they communicate"). The same is true here: Wisconsin's EAP applies to all private schools who offer instruction for a vocational or professional benefit, regardless of the content of the instruction. Private schools are free to offer any instruction,

but if they want to advertise a vocational benefit or offer an option of professional certification, they must comply with the EAP's disclosure and licensing requirements.

Other court decisions regarding licensing laws similarly support the court's content-neutral conclusion. For example, *Brokamp v. James*, 66 F.4th 374, 393 (2d Cir. 2023), and *National Association for Advancement of Psychoanalysis v. California Board of Psychology*, 228 F.3d 1043, 1055 (9th Cir. 2000) ("*NAAP*"), considered whether licensing requirements for mental health professionals requiring education, experiential and examination requirements violated the First Amendment. In rejecting the plaintiffs' First Amendment challenges, the Second and Ninth Circuits both ruled that the license requirements were content-neutral laws that "[did] not dictate what can be said" between patients and providers during treatment, but "merely determine[] who is qualified as a mental health professional." *Brokamp*, 66 F.4th at 394; *NAAP*, 228 F.3d at 1055–56; *see also Upsolve, Inc. v. James,* 155 F.4th 133, 143 (2d Cir. 2025), *cert. denied*, 146 S. Ct. 1854 (2026) (holding that New York's unauthorized practice of law statute was content-neutral because it applied to "any individual practicing law, regardless the type of law he practices or the message or position that he seeks to promote through his legal practice.")

The same conclusion applies here. Wisconsin's EAP determines what schools can provide vocational instruction based on required showings of financial stability, competency, safety, and compliance with anti-discrimination and consumer protection laws, among other things. The requirements do not "dictate what can be said" between an instructor and student; they merely determine whether a school is qualified to provide vocational instruction.

In arguing otherwise, plaintiffs rely on two cases involving challenges to state statutes regulating private schools, in which the deciding courts found restrictions to be content based and subject to strict scrutiny. In *Pacific Coast Horseshoeing Sch., Inc. v. Kirchmeyer*, 961 F.3d 1062 (9th Cir. 2020), the Ninth Circuit addressed a challenge to California's private career school "ability to benefit" statute, which required private postsecondary schools to reject students' applications if they did not have a high school diploma or GED or had not passed a prescribed exam. *Id.* at 1066. Nevertheless, the statute exempted numerous professions and types of schools from the requirement, including flight instruction, test preparers, classes sponsored by trade organizations, apprenticeship entities, nonprofit religious organizations, nonprofit public benefit corporations and community-based organizations. *Id.,* at 1071–72. The statute also contained an avocational exemption like the one at issue here. However, the Ninth Circuit concluded that whether a course was avocational (or fell under any other exception) "turn[ed] on the nature of what is being taught." *Id.*, at 1071. It further concluded that some subjects (like horseshoeing) were "solely" vocational, but others (like golf) were "solely avocational or recreational." *Id.* As such, the court concluded that the program was content based because it contained numerous exemptions that turned on: "(1) the content of what is being taught, or (2) the identity of the speaker," and thus "picked winners and losers" based on the profession and the operators of the school. *Id.*

Similarly, in *Mox v. Olson*, 807 F. Supp. 3d 926 (Min. Dist. 2025), the plaintiff, who also happened to teach equine-massage classes, challenged Minnesota's statute governing private career schools, the Minnesota Private Career School Act, which tracks Wisconsin's

EAP. *Id.*, at 931–32. Further, as here, Minnesota's Office of Higher Education had determined that the plaintiff needed to be licensed because two of her advanced classes offered certifications to students and were marketed as a way to expand career opportunities. *Id.,* at 934. Plaintiff contended that the Act was a content-based restriction on her speech, and the district court agreed, concluding that "[t]hrough its exemptions, the Act 'applies to particular speech because of the topic discussed[,]" pointing specifically to the exemptions for: adult basic education; exercise or fitness teacher programs; modeling; acting; and avocational or recreational subjects. *Id.* at 948 ("Consider, for example, a school that teaches bicycle repair. If this course's content were relevant to the Office's avocational-versus-career-enhancing determination, that would transform a purpose-directed inquiry into one that is content-based."). Thus, that court held that the "exemptions alone are enough to show the Act is content-based." *Id.,* at 949.

While plaintiffs point to these two cases as persuasive authority in support of their First Amendment argument, the laws at issue in those cases are both readily distinguishable. In invalidating California and Minnesota laws, both courts relied heavily on the exemptions in the statutes. In contrast to those exemptions, Wisconsin's general exemptions are not based on the subject taught. Except for the avocational exception at issue in this case, the Wisconsin exemptions are based on whether the education is regulated by other means: long-established in-state schools; schools regulated by different state agencies, departments, boards, and accrediting bodies; schools supported by taxes; certain parochial schools; and courses by employers for their employees (offered internally,

not to the public). Wis. Stat. §§ 440.52(1)(e)2.– 10. And *none* are content based, as they do not single out subject areas or favor particular speakers.

As for the avocational exemption, unlike those in *Kirchmeyer* and *Mox*, the EAP does not determine the "avocational" nature of a course based on the subject taught, but rather -- at least based on the record before the court at this stage -- on whether the school is *marketing* a course of instruction to the public as leading to a professional or occupational benefit. (Gage Decl. (dkt. #29) ¶¶ 21–24.) Thus, unlike the examples offered by the *Kirchmeyer* and *Mox* courts, courses on golf and bicycle repair would not automatically be "avocational"; nor would a course on horseshoeing or massage automatically be "vocational" in nature. Perhaps most importantly, the Wisconsin EAP focus on "avocational" versus "vocational" offerings goes to the heart of its emphasis on the promise extended to the potential student for future employment and the need for regulation to insure that the training and education is meaningful and likely to be remunerative.

For all of these reasons, the court concludes that because the EAP does not condition its approval on the topics or subject matters discussed by a particular school or course, it is content neutral, at least based on the information provided by the parties at this stage. Therefore, intermediate, rather than strict scrutiny, applies in deciding whether plaintiffs have a likelihood of success on their First Amendment claim. *See Free Speech Coalition*, 606 U.S. at 471 (2025) ("If a law regulating speech is content-neutral, the law is reviewed with 'intermediate scrutiny.'")

### C. Application of Intermediate Scrutiny

A professional regulation that incidentally burdens speech survives intermediate scrutiny "if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *Richwine*, 148 F.4th at 954 (quotation and citation omitted). As such, "[t]here must be a reasonably close fit between the law's means and its ends, though perfect calibration is not required." *Id.* (citing *Nicodemus v. City of South Bend*, 137 F.4th 654, 668 (7th Cir. 2025) (quotation omitted). "As the Government bears the burden of proof on the ultimate question of [a law's] constitutionality, [plaintiffs] must be deemed likely to prevail unless the Government has shown that [plaintiffs'] proposed less restrictive alternatives are less effective than [the challenged law]." *Ashcroft v. Am. C.L. Union*, 542 U.S. 656, 666 (2004).

Here, defendants have done enough, again at this early stage, to demonstrate that Wisconsin's EAP likely advances important government interests unrelated to the suppression of free speech. Defendants point to several important government interests served by the EAP, starting with broad governmental interest in consumer protection. *See Sorrel*, 564 U.S. at 579 (the government has a legitimate interest in protecting consumers from commercial harms). In particular, the state has important interests to "protect students, prevent fraud and misrepresentation in the sale and advertising of courses and courses of instruction, and encourage schools to maintain courses and courses of instruction consistent in quality, content, and length with generally accepted educational standards." Wis. Stat. § 440.52(7).

Unsurprisingly, according to the program manager for Wisconsin's EAP, the Department has received complaints about private career schools relating to the specific problems that the EAP is designed to protect, including: deceptive advertising, discrimination and discriminatory expulsion, failure to reimburse tuition, quality of instruction and facilities, and access to books, labs and practicums. (Gage Decl. (dkt. #29) ¶ 30.) Students also regularly contact the Department to obtain transcripts and records when a school they attended in the past has closed. (*Id.*) The EAP is structured to address these problems without targeting specific speech. *See Free Speech Coal.*, 606 U.S. at 496 ("Under intermediate scrutiny, a regulation is adequately tailored so long as the government's interest 'would be achieved less effectively absent the regulation' and the regulation 'does not burden substantially more speech than is necessary to further that interest.'") (citation omitted). Specifically, the EAP staff reviews information about a school's finances and ensures preservation of and access to student records, requires safety and sanitary learning facilities, and enforces nondiscrimination laws. Wis. Admin. Code Ch. SPS § 404. None of these interests are related to the suppression of protected speech or seek to censor the viewpoint taught by any school. *Richwine*, 148 F.4th at 954.

While plaintiffs suggest that professional horse massage training does not feature the risks addressed by the EAP, they offer no evidence to support the assertion that their school poses a lower risk to consumers than other professional schools regulated by the program. Indeed, plaintiffs acknowledge that the Masterson School offers a $6,000 equine bodywork certified practitioner program that takes up to two years to complete -- a significant commitment of both time and money -- with a suggestion that the certification

could enhance the student's occupational success, even if this emphasis on vocational remuneration has been deemphasized in more recent advertising and promotional materials. Thus, the EAP appears justified in ensuring that the Masterson School's students, like students of other private and public schools, are investing time and money into a program that is professional, financially sound, safe, sanitary and nondiscriminatory.

In fairness, plaintiffs also argue that the Wisconsin EAP requirements are "incredibly burdensome" (dkt. #7, at 3), and that the Department could adopt less restrictive alternatives, such as relying on existing fraud laws to protect students. However, at this stage, plaintiffs provide no real evidence to establish this. For example, they do not even state, much less document, that they attempted to complete the EAP application, but could not because it was too difficult or time-consuming. Further, as defendants point out, much of the required information should be readily available to plaintiffs, such as the school name, mission statement, owner, credit hours, course descriptions and educational objectives. According to the Department, a diligent and competent school administrator could complete the school catalogue and application process in approximately 10 hours. (Gage Decl. (dkt. #32) ¶ 18.) And plaintiffs provide no evidentiary basis to dispute defendants' estimate.

Even as to the burden of the bonding requirement, the amount of any bond is individualized and proportional to each school's revenue: the lesser of $25,000 or 125 percent of unearned tuition determined by a Wisconsin program calculation formula. Wis. Admin. Code SPS § 404.06(1). Moreover, the bond amount may be reduced if it is excessive in relation to the school's economic risk based on various financial stability

criteria. Wis. Admin. Code SPS § 404.06(1). At bottom, having apparently never asked about the bond amount that would apply to The Masterson School, plaintiffs have *no* evidentiary basis to assert that the bond requirement in this case would be overly burdensome.

Finally, plaintiffs argue that less restrictive alternatives would address the EAP's stated purpose, including: (1) an opt-in educational approval program; (2) a published list of schools that have been approved or accredited by reputable organizations; and (3) reliance on Wisconsin's general prohibitions on fraud in Wis. Stat. §§ 100.18(1) and 943.20(1)(d). However, again at this stage, defendants persuasively explain why such alternatives would not adequately serve Wisconsin's legitimate state interests in protecting students. For example, a voluntary program or accreditation by a private organization would not provide students with any financial protection if a school closes unexpectedly, ensure safe and sanitary learning facilities, guarantee access to transcripts, or provide other general protections against discrimination. (Dfts.' Br. (dkt. #26) 27.) As for Wisconsin's existing general fraud and misrepresentation statutes, they do not appear duplicative of the Wisconsin EAP's protections. Again, for example, the EAP provides additional protections of surety bond payments to fraud victims, as well as opportunities for settlement and Department involvement in fraud complaints, while these broader fraud general statutes do not. Wis. Admin. Code SPS §§ 404.06(3), 404.08(2)(b)3.

Thus, defendants have provided enough evidence at this stage to show the EAP advances important governmental interests unrelated to the suppression of free speech *and* does not burden substantially more speech than necessary to further those interests.

Because plaintiffs have not shown a likelihood of success on the merits of their First Amendment claim, the court will only briefly address the remaining preliminary injunction factors.

## III. Lack of Legal Remedies and Irreparable Harm

To support a preliminary injunction, the asserted irreparable harm must be near-term and imminent, not remote. *Finch*, 82 F.4th at 578; *Bedrossian v. Northwestern Memorial Hospital*, 409 F.3d 840, 846 n. 3 (7th Cir. 2005); *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 19 n. 6 (7th Cir. 1992). To this point, plaintiffs have provided no evidence about the financial, reputational, or other impacts on their school resulting from an inability to teach vocational classes in Wisconsin. It is not even clear how many and what type of classes plaintiffs have taught in Wisconsin in the past or what specifically they would offer or teach with or without a preliminary injunction. In particular, plaintiffs provide no evidence about whether removing the "certification" element of their classes has reduced the number of interested students.[2] Indeed, there appears to be no dispute that defendants have assured plaintiffs that they *may* teach classes in Wisconsin, so long as they do not market or hold out their Practitioner Certification Program as fulfilling *occupational or professional* objectives. (Dfts.' Br. (dkt. #26) 34) ("Masterson is free to teach his equine

[2] Given that plaintiffs waited three years to file this lawsuit or take any other steps to challenge the Department's decision after receiving its preliminary 2023 determination that they were not exempt from the EAP, the court is skeptical that plaintiffs have been significantly impacted by their inability to offer vocational classes in Wisconsin. In any event, plaintiffs have also submitted no evidence on this issue.

method in Wisconsin without program approval so long as he does not hold himself out as offering a professional program.") Regardless, plaintiffs have provided no evidence to contradict defendants' assurance, nor any evidence showing how the restriction on vocational-only courses would impact their business, so they have not shown irreparable harm absent entry of a preliminary injunction. Accordingly, this factor weighs against granting plaintiffs' request for preliminary injunctive relief.

## IV. Balance of Harm and the Public Interest

Plaintiffs' failure to establish either of the two threshold requirements for a preliminary injunction means that this court need not consider the balance of equities, the public interest, or weigh the harm of denying the injunction against the harm of granting the injunction. *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531 (7th Cir. 2021). Even so, these considerations weigh heavily against granting the preliminary injunction.

As discussed above, plaintiffs' classes and certification program are expensive and time consuming. If excused from the EAP requirements, plaintiffs' students would take classes in Wisconsin intended to confer professional and vocational benefits without protections offered vocational students at other schools, including fair tuition reimbursement policies, safe and sanitary facilities, quality instruction, record retention, and protection from discrimination. Accordingly, the court is persuaded that the balance of equities in granting an injunction weighs against plaintiffs and the public interest as well.

ORDER

IT IS ORDERED that:

1) Plaintiffs' motion for preliminary injunctive relief (dkt. #2) is DENIED.

2) Plaintiffs' motion for leave to file a reply brief in support of their motion for preliminary injunction (dkt. #31) is GRANTED.

Entered this 25th day of November, 2026.

BY THE COURT:

/s/

WILLIAM M. CONLEY
District Judge